# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CATHERINE LANGER           :
    Plaintiff               :     Civil Action No.:   3:22-cv-1459
                            :
v.                            :
                            :
HARTLAND BOARD OF EDUCATION    :
    Defendant.            :     NOVEMBER 15, 2022

## NOTICE OF REMOVAL

To the United States District Court for the District of Connecticut:

PLEASE TAKE NOTICE that Defendant, Hartland Board of Education, respectfully removes this action from the Superior Court of the State of Connecticut Judicial District of Litchfield at Torrington to the United States District Court for the District of Connecticut, pursuant to 28 U.S.C. § 1441, and as grounds therefore states as follows:

1.      Plaintiff has commenced an action against the Defendant in the Superior Court of the State of Connecticut Judicial District of Litchfield at Torrington, by service of a Summons and complaint dated October 19, 2022.  The Plaintiff served by State Marshal a copy of the Summons and complaint upon the municipal defendant on or about November 1, 2022.  The case was assigned Case No.:  LLI-CV22-6032078-S in the records and files of that Court ("State Court Action").  Pursuant to 28 U.S.C. § 1446(a), the Defendant hereby attaches the Summons and Complaint hereto as Exhibit A.

2.      The State Court Action is returnable to the Superior Court of the State of Connecticut Judicial District of Litchfield at Torrington on November 22, 2022.

3.      The State Court Action is a suit of a wholly civil nature of which the United States District Court for the District of Connecticut has original jurisdiction under 28 U.S.C. §§ 1331 and

1343(a)(3).   Plaintiff alleges a violation of her rights pursuant to 42 U.S.C. § 1983 and discrimination on the basis of her religious beliefs in violation of Title VII of the Civil Rights Act of 1964, as amended.  This action may therefore be removed to this Court pursuant to 28 U.S.C. § 1441. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4.      Attached hereto in compliance with 28 U.S.C. § 1446(a), are complete and accurate copies of the process and pleadings received by the Defendant to date.

5.      Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is being filed within thirty days of the date of service of process on Defendant.

6.      Defendant is providing written notice of the filing of this Notice of Removal to Plaintiff and is filing a copy of this Notice of Removal with the Clerk of the Superior Court of Connecticut Judicial District of Litchfield at Torrington, pursuant to 28 U.S.C. § 1446(d).

WHEREFORE, Defendant respectfully requests that this action be removed from the Superior Court of the State of Connecticut Judicial District Litchfield at Torrington to the United States District Court for the District of Connecticut.

Respectfully submitted,

Attorneys for Defendant
Hartland Board of Education

  /s/ Johanna G. Zelman
Johanna G. Zelman (ct26966)
Marissa Vitolo (ct31352)
FordHarrison, LLP
CityPlace II
185 Asylum Street, Suite 820
Hartford, CT 06103
Tel #:  860-740-1355
Fax #:  860-578-2075
Email:  jzelman@fordharrison.com
        mvitolo@fordharrison.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been sent to all counsel of record via the United States Postal Service, First Class Mail, postage prepaid or email, this 15th day of November, 2022 to:

Matthew S. Carlone, Esq.
Terk & Carlone, LLC
81 Wolcott Hill Road
Wethersfield, CT 06109
mcarlone@terkcarlone.com

   /s/ Johanna G. Zelman
Johanna G. Zelman

# EXHIBIT A

**SUMMONS - CIVIL**
JD-CV-1   Rev 2-22
C G S §§ 51-346, 51-347, 51-349, 51 350, 52 45a, 52-48, 52 259;
P B §§ 3-1 through 3-21, 8-1, 10-13

| | For information on ADA accommodations, contact a court clerk or go to: www.jud.ct.gov/ADA. | STATE OF CONNECTICUT SUPERIOR COURT www.jud.ct.gov |
|---|---|---|



Instructions are on page 2.

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE

☒ Select if claiming other relief in addition to, or in place of, money or damages.

---

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk (Number, street, town and zip code) | Telephone number of clerk | Return Date (Must be a Tuesday) |
|---|---|---|
| 50 Field St, Torrington, CT 06790 | (860 ) 626 − 2100 | November 22, 2022 |

| ☒ Judicial District | G.A. | At (City/Town) | Case type code (See list on page 2) | |
|---|---|---|---|---|
| ☐ Housing Session | ☒ Number: 18 | Torrington | Major: M | Minor: 90 |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented (Number, street, town and zip code) | Juris number (if attorney or law firm) |
|---|---|
| Terk & Carlone, LLC 81 Wolcott Hill Road, Wethersfield, CT 06109 | 434408 |

| Telephone number | Signature of plaintiff (if self-represented) |
|---|---|
| (860 )563 − 9494 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book (if agreed) mcarlone@terkcarlone.com |
|---|---|

| Parties | Name (Last, First, Middle Initial) and address of each party (Number; street; P.O. Box; town; state; zip; country, if not USA) | |
|---|---|---|
| First plaintiff | Name: Catherine Langer  Address: 19 Carriage Lane, Barkhamsted, CT 06063 | P-01 |
| Additional plaintiff | Name:  Address: | P-02 |
| First defendant | Name: Hartland Board of Education  Address: 30 South Road, East Hartland, CT 06027 | D-01 |
| Additional defendant | Name:  Address: | D-02 |
| Additional defendant | Name:  Address: | D-03 |
| Additional defendant | Name:  Address: | D-04 |
| Total number of plaintiffs: 1 | Total number of defendants: 1 | ☐ Form JD-CV-2 attached for additional parties |

**Notice to each defendant**

1. You are being sued. This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   The court staff is not allowed to give advice on legal matters.

| Date 10-11-22 | Signed (Sign and select proper box) | ☒ Commissioner of Superior Court ☐ Clerk | Name of person signing Matthew S. Carlone |
|---|---|---|---|

If this summons is signed by a Clerk

a. The signing has been done so that the plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law.
c. The court staff is not permitted to give any legal advice in connection with any lawsuit.
d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint.

| | For Court Use Only |
|---|---|
| | File Date |

A TRUE COPY ATTEST

KEITH D. NIZIANKIEWICZ
CONNECTICUT STATE MARSHAL
INDIFFERENT PERSON

| I certify I have read and understand the above: | Signed (Self-represented plaintiff) | Date | Docket Number |
|---|---|---|---|

RETURN DATE: NOVEMBER 22, 2022     :     SUPERIOR COURT

CATHERINE LANGER               :     J.D. OF LITCHFIELD

v.                                      :     AT TORRINGTON

HARTLAND BOARD OF EDUCATION     :     OCTOBER 19, 2022

## COMPLAINT

## COUNT ONE: Employment Discrimination – C.G.S. §64a-60, et seq.

     1.     The plaintiff, Catherine Langer, is an individual residing in Barkhamsted, Connecticut.

     2.     The defendant, Hartland Board of Education, is a quasi-municipal corporation, with a business address of 30 South Road, East Hartland, CT 06027.

     3.     The plaintiff was previously employed by the defendant for 13 years as school teacher in the Hartland public school system.

     4.     On March 10, 2020, Connecticut Governor, Edward Lamont formally declared a "public health emergency" due to COVID-19.[1]

     5.     On August 19, 2021, Governor Lamont issued Executive Order No. 13D which mandates that the Plaintiffs receive the COVID-19 vaccines as a condition of their ongoing

---

[1]     Governor Edward Lamont, Declaration of Emergency and Civil Preparedness, March 10, 2020, https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf

employment.[2] EO 13D, which was subsequently amended by Executive Order 13G,[3] explicitly stated that the drug was being administered under emergency use authorization:

> "COVID-19 vaccines are safe and effective, were evaluated in clinical trials involving tens of thousands of participants and met the U.S. Food & Drug Administration's rigorous scientific standards for safety, effectiveness, and manufacturing quality needed to support emergency use authorization…" (emphasis added)

Executive Order 13D and Executive Order 13G are collectively referred to as the "Vaccine Mandate" hereinafter.

6.      The Vaccine Mandate required all "covered workers" to receive a COVID-19 vaccine or submit to mandatory weekly testing.  A "covered worker" was defined as "all employees, both full and parttime, contract workers, providers, assistants, substitutes, and other individuals working in a public or non-public pre-K to grade 12 school system."

7.      The Vaccine Mandate further provided that any "covered worker" who did not comply with the Vaccine Mandate was subject to the penalties and enforcement provisions set forth with more particularity therein.

---

[2]      Gov. Lamont, Protection of Public Health and Safety During COVID-19 Pandemic-Vaccinations Required For State Employees, School Employees and Childcare Facility Staff, Executive Order No. 13D (Aug. 19, 2021), https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-13D.pdf

[3]      Gov. Lamont, Protection of Public Health and Safety During COVID-19 Pandemic-Vaccinations Required For State Employees, School Employees and Childcare Facility Staff, Executive Order No. 13G (Sept. 30, 2021), https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-13G.pdf

TERK & CARLONE, LLC
81 WOLCOTT HILL ROAD • WETHERSFIELD, CT 06109 • (860) 563-9494 • FAX (860) 563-6088 • JURIS NO. 434408

8.      The Hartland public school system fell under the scope of the Governor's Vaccine Mandate and consequently, the Plaintiff fell within the definition of a "covered worker" under the Vaccine Mandate was and was therefore directly subject to its terms.

9.      The Defendant enforced the Vaccine Mandate by mandating that its employees, including the Plaintiff, get vaccinated against COVID-19.

10.     On or about September 24, 2021, Ms. Langer submitted a religious exemption request for the vaccine, as well as an exemption to weekly testing, to the Superintendent of schools, Imma Canelli, but the exemption request was denied that same day.

11.     On or about September 25, 2021, Ms. Langer submitted an appeal regarding her denied religious exemption request to Ms. Canelli.

12.     The exemption request appeal suggested an accommodation of working from home, believing it be mutually agreeable, as there are always two other employed adults in the classroom, and lessons could be live streamed with no financial burden on the Defendant.

13.     Sometime between September 25th and September 28th, Ms. Lander's exemption appeal, with the requested accommodation of working from home, was denied.

14.     On or about September 29, 2021, the Plaintiff had an in-person meeting with the principal, Alyssa Goguen. During this meeting, Ms. Goguen informed the Plaintiff that although she had not been in contact with the Superintendent, she was aware of the ongoing issue with her requested accommodations, and had been told by another employee that Ms. Langer was leaving her position. After hearing what had happened with the accommodation

requests, Ms. Goguen stated she wanted to help resolve the situation and suggested a meeting between herself, Ms. Canelli, and Ms. Langer.

15.     On or about September 30, 2021, Ms. Langer had a meeting with Ms. Goguen and Ms. Canelli. During this meeting, Ms. Langer explained the stress this situation was causing her having to teach full time while having to constantly worry about the possibility of losing her job. Ms. Langer further explained how the COVID-19 vaccine, as well as the weekly testing protocol, violated her religious beliefs. Ms. Canelli stated she had conferred with other school districts regarding possible accommodations, but that there was nothing that she or the Defendant could do in this matter.

16.     At the conclusion of this meeting, Ms. Langer was told that October 1, 2021 would be her last day and that she would be placed on unpaid administrative leave beginning October 4, 2021.

17.     On or about October 1, 2021, Ms. Langer was called into the main office at the end of the day and asked to turn in her key and work computer.

18.     On or about October 2, 2021, Ms. Langer's school email was disabled, which prohibited her from access work related documents.

19.     By October 11, 2021, Ms. Langer still had not received any documentation from the Defendant regarding any disciplinary action. As such, Ms. Langer reached out to Ms. Canelli requesting this documentation, to which she responded that they had been sent via postal mail.

20.     On or about October 15, 2021, Ms. Langer received a letter from the Defendant, dated October 5th, stating that she was on unpaid administrative leave until further notice.

21.     In putting Ms. Langer on unpaid administrative leave, the Defendant discriminated against her based on her religious beliefs.

22.     Ms. Langer subsequently contacted her Union representative in an attempt to file a grievance but was told by the Union that they would not accept a grievance, as the new mandates regarding COVID-19 vaccine were not in the employment contracts.

23.     On or about February 14, 2022, Ms. Langer was contacted by Ms. Canelli for the first time since October 2021, to inform her that the Defendant wanted to have a meeting to discuss removing her from unpaid administrative leave. The meeting was scheduled for February 16, 2022.

24.     On or about February 16, 2022, Ms. Langer had a meeting with Ms. Canelli who explained that the Defendant was concerned that, because she had not seen her students since September 30, 2021 due to being been on unpaid administrative leave, the Defendant wanted to "ease her back" into her teaching position over a period of time rather than having her immediately resume her teaching duties in full.

25.     Based on the concerns raised by the Defendant in the February 16th meeting, on or about February 24, 2022, Ms. Langer submitted a written request to take personal leave for the remaining portion of the 2021-2022 school year with the intent to return fully for the

TERK & CARLONE, LLC
81 WOLCOTT HILL ROAD · WETHERSFIELD, CT 06109 · (860) 563-9494 · FAX (860) 563-6088 · JURIS NO. 434408

2022-2023 school year, explaining that she believed this was in the best interest the students under the circumstances.

26.     On or about February 24, 2022, Ms. Langer received a response from Ms. Canelli stating that she would forward the request for personal leave to the Defendant for consideration.

27.     On or about March 15, 2022, Ms. Langer received notice from Ms. Canelli that the Defendant denied her request for personal leave at a meeting held on March 14, 2022 and that she needed to report to Ms. Canelli's office on March 17, 2022 to work out the immediate return to her teaching position. The Defendant did not provide an explanation for denying Ms. Langer's request for personal leave.

28.     At the time the Defendant sent this notice, the Defendant knew Ms. Langer could not return to work upon less than 48 hours notice because at the February 16th meeting, Ms. Langer explained to Ms. Canelli that she was forced to take on other employment obligations as a consequence of being placed on unpaid administrative leave on October 1, 2022, in order to make ends meet.

29.     The Defendant's pattern of conduct toward Ms. Langer evidences that Defendant's denial of her request for personal leave and subsequent demand to return to work within 48 hours, knowing that Ms. Langer could not meet this demand, was done in retaliation for refusing to compromise her religious beliefs and purposely done to create a pretext for firing her.

30.     The Defendant purposefully gave Ms. Langer less than 48 hours notice to return to work knowing that she could not meet this demand as doing so was consistent with the Defendant's pattern of discriminatory conduct toward the Plaintiff.

31.     On or about March 16, 2022, Ms. Langer sent a written response to Ms. Canelli again explaining that she was unable to return to work for the Defendant on less than 48 hours notice due to other employment obligations she was forced to take on a consequence of being placed on unpaid administrative leave.

32.     On or about March 17, 2022, I received a letter from Ms. Canelli, on behalf of the Defendant, terminating her employment with the Defendant (the "Termination Letter").

33.     The Termination Letter falsely stated that I had been granted a leave of absence since October 2021 "in light of [my] refusal to comply with the Governor's Executive Order with respect to COVID-19 testing." Ms. Canelli knew that this statement was false at the time she made it because she had personally put the Plaintiff on unpaid administrative leave on October 1, 2021 after the Defendant denied her religious exemption request and request for accommodation described with more particularity above. Accordingly, Ms. Canelli knew the Defendant has never granted Ms. Langer a leave of absence for any reason at any time relevant herein.

34.     The Termination Letter also falsely stated that the Defendant was "considering [Ms. Langer's] refusal to come to work as an abandonment and/or irrevocable resignation from [her] employment." Ms. Canelli knew that this statement was false at the time she made

TERK & CARLONE, LLC

it because, as she acknowledged earlier in the Termination Letter, that Ms. Langer had previously explained that she could not return to work on less than 48 hours notice.

35.     Further, the Termination Letter falsely stated that "the Hartland School District accepts [Ms. Langer's] resignation, effective March 17, 2022." Ms. Langer never resigned from her employment, nor did she ever make any statement that could be reasonably construed as a resignation. Accordingly, the purpose of this statement was to obfuscate the fact that the Defendant was firing her in retaliation for religious beliefs in an effort to avoid legal liability for doing so.

36.     The Defendant fired Ms. Langer in retaliation for her religious beliefs and was a clear continuation of its action toward her since October 2021, and described with more particularity above. Accordingly, Ms. Langer was fired in violation of Connecticut General Statutes §46a-60, *et seq*.

37.     As a direct result and consequence of the Defendants actions the Plaintiff has suffered monetary damages, including, but not limited to, lost wages.

38.     On or about November 5, 2021, the Plaintiff filed a claim for employment discrimination against the defendant with the Connecticut Commission on Human Rights and Opportunities ("CHRO") in connection with being placed on unpaid administrative leave, which claim was identified by Case No. 2230240.

39.     On or about July 5, 2022, the Plaintiff filed a claim for retaliatory termination against the defendant with the CHRO, which claim was identified by Case No. 2330005.

TERK & CARLONE, LLC
81 WOLCOTT HILL ROAD • WETHERSFIELD, CT 06109 • (860) 563-9494 • FAX (860) 563-6088 • JURIS NO. 434408

40.     On or about August 17, 2022, the Plaintiff obtained a release of jurisdiction from the CHRO for Case No. 2230240, pursuant to C.G.S. §46a-103. A copy of the release of jurisdiction from the CHRO is attached hereto as Exhibit A.

41.     On or about August 17, 2022, the Plaintiff obtained a release of jurisdiction from the CHRO for Case No Case No. 233005, pursuant to C.G.S. §46a-103. A copy of the release of jurisdiction from the CHRO is attached hereto as Exhibit B.

## COUNT TWO: (Violation of Title VII):

1-35.   Paragraphs 1 through 35 of Count One are hereby incorporated as Paragraphs 1 through 35 of Count Two reference as if fully alleged herein.

36.     In putting Ms. Langer on unpaid administrative leave, the Defendant discriminated against her based on her religious beliefs in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

37.     That Defendant's denial of Ms. Langer's request for personal leave and subsequent demand to return to work within 48 hours, knowing that Ms. Langer could not meet this demand, was done in retaliation for refusing to compromise her religious beliefs, in violation of Title VII.

38.     The Defendant fired Ms. Langer in retaliation for her religious beliefs and was a clear continuation of its action toward her since October 2021, and described with more particularity above. Accordingly, Ms. Langer was fired in violation of Title VII.

TERK & CARLONE, LLC

39.     As a direct result and consequence of the Defendants actions the Plaintiff has suffered monetary damages, including, but not limited to, lost wages.

40.     On or about November 5, 2021, the Plaintiff filed a claim for employment discrimination against the defendant with the U.S. Equal Employment Opportunities Commission ("EEOC") in connection with being placed on unpaid administrative leave, which claim was identified by Charge No. 16A-2022-00214.

41.     On or about July 5, 2022, the Plaintiff filed a claim for retaliatory termination against the defendant with the EEOC, which claim was identified by Charge No. 16A-2022-00969.

42.     On or about September 6, 2022, the Plaintiff obtained a release of jurisdiction from the EEOC for Charge No. 16A-2022-00214. A copy of the release of jurisdiction from the EEOC is attached hereto as Exhibit C.

43.     On or about September 6, 2022, the Plaintiff obtained a release of jurisdiction from the EEOC for Charge No. 16A-2022-00969. A copy of the release of jurisdiction from the EEOC is attached hereto as Exhibit D.


COUNT THREE (§1983 – Violation of Civil Liberties):

1-41.     Paragraphs 1 through 41 of Count One are hereby incorporated as Paragraphs 1 through 41 of Count Three reference as if fully alleged herein.

42.     As demonstrated below, the Defendant's actions violated the Plaintiffs' right to bodily autonomy, medical privacy and equal protection guaranteed under the Fourth, Fifth

TERK & CARLONE, LLC
81 WOLCOTT HILL ROAD · WETHERSFIELD, CT 06109 · (860) 563-9494 · FAX (860) 563-6088 · JURIS NO. 434498

and Fourteenth Amendments to the United States Constitution. Accordingly, the Plaintiff brings a claim for damages under 42 U.S.C. §1983, to remedy the violation of her civil rights.

43.    In support of this claim, the Plaintiff will use the official data published by the Center for Disease Control and Prevention ("CDC"), the Connecticut Department of Public Health ("CT DPH"), and the clinical data submitted by the drug manufacturers (Pfizer and Moderna) to the U.S. Food and Drug Administration ("FDA"), to demonstrate:

(A)    By enforcing the Vaccine Mandate, Defendants illegally coerced the Plaintiff to take a drug that is, by definition, experimental because the only COVID-19 vaccines available in the United States are being administered exclusively under Emergency Use Authorization (EUA).

(B)    At the time the Defendant enforced the Vaccine Mandate, publicly available data demonstrated that the COVID-19 vaccines are not safe, causing more deaths and severe adverse events than every other previous vaccine combined.

(C)    At the time the Defendant enforced the Vaccine Mandate, publicly available data demonstrated that the COVID-19 vaccines do not preventing infections or transmission of COVID-19, and therefore do not provide any benefit to the public health.

(D)    At the time the Defendant enforced the Vaccine Mandate, publicly available data demonstrated that the COVID-19 vaccines have a **negative efficacy** against the "Omicron" variant. In other words, the vaccines actually *increase* the likelihood of contracting COVID-19.

TERK & CARLONE, LLC

44.     Consequently, the mandatory testing provision of the Vaccine Mandate has no basis in evidentiary science because it required the unvaccinated Plaintiff to submit to mandatory weekly testing while exempting her vaccinated coworkers, even though the evidence available at the time demonstrated that vaccinated individuals are more likely to test positive for COVID-19. Thus, the sole purpose of mandatory testing was to punish and coerce the Plaintiff into taking a COVID-19 vaccine against their will.

A.     **The Defendant Illegally Coerced The Plaintiff Take An Experimental Drug In Order to Comply With The Vaccine Mandate Because The Only COVID-19 Vaccines Available Are Administered Under Emergency Use Authorization**

45.     Prior to the introduction of the COVID-19 vaccine, a vaccine has always been an injection of an attenuated (i.e. weakened) strain of a virus which allows the body's immune system to learn how to fight the virus to prevent future infection and transmission of the targeted disease.[4]

46.     The COVID-19 vaccines, on the other hand, utilize employ a novel mRNA technology—most accurately classified as a gene therapy—that has never been used in any previous vaccine distributed to the public. In fact, both Pfizer and Moderna describe their products as a "gene therapies" in their filings with the Securities and Exchange Commission.[56]

---

[4]     Flint, Jane, et al., PRINCIPLES OF VIROLOGY, VOL. 1: MOLECULAR BIOLOGY (Kindle, 5th Edition 2020). ASM Press, pp. 9, 562

[5]     *Moderna, Inc.,* United States Securities and Exchange Commission, Form 10-Q, Quarterly Report Pursuant to Section 13 or 15(D) of the Securities Exchange Act of 1934 (for the quarterly period ended June 30, 2020), https://www.sec.gov/Achieves/edgar/data/182852/000168285220000017mrna-20200630.htm

[6]     *BioNTech SE,* United States Securities and Exchange Commission, Form F-1

47.     The mRNA technology in a COVID-19 vaccine sends genetic coding information to a person's cells which instructs the ribosome to create the "spike protein" of the original Alpha (i.e. Wuhan or wild type) strain of the SARS-CoV-2 virus.[7] Simultaneously, adjuvants in the vaccine stimulate the body's immune system so that the immune system attacks the "spike proteins" which were created by the ribosomes. This process programs the individual's immune system to recognize and attack the "spike protein" of the Alpha (i.e. Wuhan or wild type) strain of the SARS-CoV-2 virus when is encountered in the future. [8]

48.     While the pharmaceutical companies and vaccine manufacturers claim that the "spike protein" produced by the ribosomes are inert, researchers from the Salk Institute published a paper on March 31, 2021 which found that the "spike protein" produced by the

---

Registration State, filed Sept. 9, 2019,
https://www.sec.gov/Archives/edgar/data/1776985/000119312519241112/d635330df1.htm
[7].     CDC. Understanding How COVID-19 Vaccines Work, *available at* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/how-they-work.html
;*see also*, Seneff (2021), Worse Than the Disease? Reviewing Some Possible Unintended Consequences of the mRNA Vaccines Against COVID-19, *International Journal of Vaccine Theory, Practice and Research* 2(1), May 10, 2021, pp. 42- 43, *available at* https://dpbh.nv.gov/uploadedFiles/dpbhnvgov/content/Boards/BOH/Meetings/2021/SENEF F~1.PDF (mRNA is encoding information, naturally created by the human body in the process of cell replication and production, which instructs the ribosome to produce certain proteins); Flint. Jane. et al.. PRINCIPLES OF VIROLOGY, VOL. 1: MOLECULAR BIOLOGY (Kindle, 5th Edition 2020). ASM Press, pp. 3,19,21.
[8].     Seneff. Worse Than the Disease? Reviewing Some Possible Unintended Consequences of the mRNA Vaccines Against COVID-19, *International Journal of Vaccine Theory, Practice and Research* 2(1), May 10, 2021, at pp. 42-43, 47-48. *available at* https://dpbh.nv.gov/uploadedFiles/dpbhnvgov/content/Boards/BOH/Meetings/2021/SENEF F~1.PDF

COVID-19 vaccines are not harmless, but are cytotoxic and linked to inflammation and related disease.[9]

49.　The Food, Drug and Cosmetic Act ("FDCA") generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until the U.S. Food and Drug Administration ("FDA") has approved the drug or biological product as "safe and effective for its intended use." FDCA §§ 301(a), 505(a), 21 U.S.C. §§ 331(a), 355(a); 42 US.C. § 262(a).

50.　A vaccine is both a drug and a biological product under the FDCA. FDCA §201(g), 21 U.S.C. §321(g); 42 U.S.C. §262(i)(1).

51.　Section 564 of the FDCA (21 U.S.C. §360bbb-3), authorizes the FDA to issue an "emergency use authorization" (EUA) for a medical drug, device or biologic, such as a vaccine, under certain emergency circumstances.　Pursuant to subsection (c)(3), this authorization is expressly conditioned on the non-existence of any "adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition."

52.　On December 11, 2020, the FDA issued EUA 27034 to Pfizer, Inc. for use of the Pfizer-BioNTech COVID-19 Vaccine ("BNT162b2") to prevent COVID-19 for individuals 16 years of age and older pursuant to Section 564 of the Act.[10] One week later the FDA issued

---

[9].　Lei, Yuyang, et al. (2021), SARS-CoV-2 Spike Protein Impairs Endothelial Function via Downregulation of ACE 2, Circulation Research (March 31, 2021). https://pubmed.ncbi.nlm.nih.gov/33784827/
[10].　FDA, Emergency Use Authorization (EUA) for an Unapproved Product Review

TERK & CARLONE, LLC

EUA 27073 for the Moderna COVID-19 vaccine ("mRNA-1273 Vaccine")[11] and subsequently issued an EUA for the Johnson & Johnson COVID-19 vaccine ("Janssen Vaccine") on February 27, 2021.[12]

53.    The FDA subsequently issued a Decision Memorandum extending EUA 27034 for Pfizer's BNT162b2 vaccine on May 10, 2021.[13] In its decision to extend EUA 27034, the FDA admitted that they did not have fundamental and critical information concerning the Pfizer BNT162b2 COVID-19 vaccine including the following:

- Duration of protection
- Effectiveness in certain populations at high risk of severe COVID-19
- Effectiveness in individuals previously infected with SARS-CoV-2
- Future vaccine effectiveness as influenced by characteristics of the pandemic, changes in the virus, and/or potential effects of co-infections
- Vaccine effectiveness against asymptomatic infection
- Vaccine effectiveness against long-term effects of COVID-19 disease
- Vaccine effectiveness against mortality
- Vaccine effectiveness against transmission of SARS-CoV-2

54.    The FDA subsequently extended EUA 27034 again on August 12, 2021.[14]

55.    On August 23, 2021, pursuant to Section 564 of the FDCA, 21 U.S.C. §360bbb-3, the FDA issued a letter to BioNTech, care of Pfizer, approving a Biologics License for

---

Memorandum (Pfizer) (Dec. 11, 2020), https://www.fda.gov/media/144416/download
[11].    FDA, Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum (Moderna) (Dec. 18, 2020), https://www.fda.gov/media/144673/download
[12].    FDA, Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum (Janssen) (Feb. 27, 2021), https://www.fda.gov/media/146338/download
[13].    FDA, Comirnaty and Pfizer-Biontech Vaccines. Memorandum Decision (May 10. 2021). p. 38, https://www.fda.gov/media/148542/download
[14].    FDA, Comirnaty and Pfizer-Biontech Vaccines. Memorandum Decision (Aug. 12, 2021). https://www.fda.gov/media/151613/download

TERK & CARLONE, LLC
81 WOLCOTT HILL ROAD • WETHERSFIELD, CT 06109 • (860) 563-9494 • FAX (860) 563-6088 • JURIS NO. 434408

"COMIRNATY" a COVID-19 vaccine for individuals 16 years of age and older pursuant to Section 564 of the Act.[15]

56.     However, also on August 23, 2021, the FDA issued a "Letter of Authorization" to Pfizer extending EUA 27034 for the BNT162b2 COVID-19 vaccine. [16]

57.     In the August 23, 2021 Letter of Authorization, extending EUA 27034 for the BNT162b2 vaccine, the FDA admitted that the Comirnaty and BNT162b2 vaccines are "legally distinct with certain differences."[17]

58.     Pursuant to 21 U.S.C. §360bbb-3(c)(3), once the FDA issued the Biologics License for Comirnaty, the FDA was legally required to retract and/or rescind its EUA for the BNT162b2 vaccine as well as the mRNA-1273 and Janssen vaccines. However, the FDA did not retract and/or rescind the EUA for the BNT162b2, mRNA-1273 and Janssen vaccines because the Comirnaty vaccine is currently **not available** for distribution and consumption at the time the FDA issued its BLA:

> "Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to prevent COVID-19 in individuals 16 years of age or older, there is not sufficient approved vaccine available for distribution to this population in its entirety at the time of reissuance of this EUA." [18]

---

[15]     FDA, Comirnaty and Pfizer-Biontech Vaccines, Comirnaty, Approval Letter (Aug. 23, 2021), available at https://www.fda.gov/media/151710/download:
FDA, FDA Approves First COVID-19 Vaccine (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine

[16]     FDA, Comirnaty and Pfizer-Biontech Vaccines, Letter of Authorization [Pfizer-Bionetch] (Aug. 23, 2021), reissued (Jan. 3, 2022),
https://www.fda.gov/media/150386/download

[17]     Id. at FN. 8, https://www.fda.gov/media/150386/download

[18]     Id. at FN. 9, https://www.fda.gov/media/150386/download

TERK & CARLONE, LLC

59.    In other words, on August 23, 2021, the FDA granted a Biologics License for the "Comirnaty" vaccine even though it was not available in the United States, and simultaneously extended the EUA for the BNT162b2 so that the experimental version of the drug could continue to be administered under EUA. The purpose of doing this was to allow the drug manufacturers to continue to have complete legal immunity from product liability under the EUA statute, while deceiving the public into thinking that they were taking an FDA approved drug, while it was never possible to take the approved version of the COVID-19 vaccine.

60.    Indeed, at the time the Vaccine Mandate was in effect, the CDC official website explicitly stated that the FDA licensed product, Comirnaty, was not available:

> "**COMINARTY products are not orderable at this time**. NDCs are listed per FDA Structured Product Label (SPL) document for the BLA licensed product. These codes are not included in CDC Vaccine Code Set files at this time.  Pfizer has provided the following statement regarding the COMINARTY branded NDCs and labels: Pfizer received FDA BLA license on 8/23/2021 for its COVID-19 vaccine for use in individuals 16 and older (COMIRNATY).  At that time, the FDA published a BLA package insert that included the approved new COVID-19 vaccine tradename COMIRNATY and listed 2 new NDCs (0069-1000-03, 0069-1000-02) and images of labels with the new tradename. **At present, Pfizer does not plan to produce any product with these new NDCs and labels over the next few months while EUA authorized product is still available and being made available for U.S. distribution.**  As such, the CDC, AMA, and drug compendia may not publish these new codes until Pfizer has determined when the product will be produced with the BLA labels."[19]

61.    The FDA executed the same bait-and-switch again with Moderna's COVID-19

---

[19]    CDC, COVID-19 Vaccine Codes,
https://www.cdc.gov/vaccines/programs/iis/COVID-19-related-codes.html

TERK & CARLONE, LLC

vaccine. On January 31, 2022, the FDA issued a press release stating that it granted BLA to Moderna for their COVID-19 vaccine labeled "SPIKEVAX."[20] However, unlike the BLA issued for Pfizer's "Comirnaty," as of the date of this lawsuit, there is no BLA letter issued to Moderna under the "Regulatory Action" section of the FDA website.[21]

62.     On January 31, 2022, the FDA issued a Letter of Authorization to Moderna extending EUA 27073 for its mRNA-1273 vaccine just as the FDA did with Pfizer's products in August of 2021.[22] In this Letter of Authorization the FDA sates that Spikevax is "legally distinct" from the mRNA-1273 vaccine,[23] and that "there is not sufficient approved vaccine available for distribution to this population in its entirety at the time of reissuance of this EUA."[24]

63.     Therefore, the Plaintiff could not take an FDA licensed COVID-19 vaccine to comply with the Vaccine Mandate because none was ever available. Rather, the Plaintiff could only take an experimental COVID-19 vaccine being administered under EUA.

64.     The legal distinction between Pfizer's Comirnaty and the BNT162b2 vaccine, as well as Moderna's Spikevax and mRNA-1273 vaccine, is critical. The EUA statute

---

[20]     FDA, Coronavirus (COVID-19) Update: FDA Takes Key Action by Approving Second COVID-19 Vaccine, https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-takes-key-action-approving-second-covid-19-vaccine

[21]     FDA, Spikevax and Moderna Vaccine, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/spikevax-and-moderna-covid-19-vaccine

[22]     FDA, Letter of Authorization, https://www.fda.gov/media/144636/download

[23]     Id. at FN. 9

[24]     Id. at FN. 11

incorporates the long-recognized principle of informed consent, stating that anyone to whom the product (i.e., the vaccine) is administered must be informed of the option to accept or refuse it, as well as the alternatives to the product and the risks and benefits of receiving it.

65.    The FDCA explicitly states that a drug or biologic under EUA cannot be administered to an individual unless the individual is informed: (1) that the product is being administered under an Emergency Use Authorization; (2) of the significant known and potential benefits and risks of such use, and the extent to which such benefits and risks are unknown; and (3) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks. 21 U.S.C. §360bbb-3(e)(1)(A)(ii).

66.    Under the EUA statute, the FDA must ensure that "[a]ppropriate conditions designed to ensure that individuals to whom the product is administered are informed" of certain things, including "the option to accept or refuse administration of the product." FDCA §564€(1)(A)(ii)(III); 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)

67.    In furtherance of its obligation to implement and imposes and the "option to accept or refuse" condition under §360bbb-3(e)(1)(A)(ii)(III), the FDA by requiring that every potential recipients of a vaccine under EUA receive a copy of the Fact Sheet which states: "It is your choice to receive or not receive [the vaccine]."

68.    Moreover, the FDA has made clear that, "[i]In an emergency, it is critical that the conditions that are part of the EUA or an order or waiver issued pursuant to section 564A— those that the FDA has determined to be necessary or protect the public health—be strictly

followed and that no additional conditions be imposed.[25]

69.    It impossible for the Plaintiff to give informed consent to receive a COVID-19 vaccine to comply with the Vaccine Mandate because the FDA went to extraordinary lengths to conceal critical data concerning the safety and efficacy of the COVID-19 vaccines from the public. For example, in response to a Freedom of Information Act ("FOIA") request for a copy of all documents and information the FDA relied upon in granting licensure to the Comirnaty vaccine, the FDA asked the federal court to delay complete disclosure over the course of seventy-five (75) years. Ultimately, the FDA was ordered to disclose 55,000 pages of information every month beginning on January 31, 2022 so that full disclosure would not have occurred during the time the Vaccine Mandate was in effect.[26]

**B.    The COVID-19 Vaccines are Not Safe**

70.    Prior to Defendant implementing the Vaccine Mandate, Pfizer published a six month update on its still ongoing Phase 3 trial (NCT04368728) in *The New England Journal of Medicine* which revealed significant red flags concerning the safety of its BNT162b2 vaccines.[27] For example, the data reported in Table S3, reproduced below, evidenced that

---

[25]      FDA, *Emergency Use Authorization of Medical Products and Related Authorities – Guidance for Industry and Other Stakeholders*, January 2017, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-use-authorization-medical-products-and-related-authorities

[26]      *Public Health and Medical Professionals for Transparency v. Food and Drug Administration*, Case No.: 4:21-cv-1058-P, ECF Nos. 20, 29, 35 (Jan. 6, 2020)

[27]      FDA, Vaccines and Related Biological Products Advisory Committee September 17, 2021, https://www.fda.gov/advisory-committees/advisory-committee-calendar/vaccines-and-related-biological-products-advisory-committee-september-17-2021-meeting-announcement

there were 5,241 related adverse events reported in the vaccine arm of the trial compared to

1,311 such events reported in the placebo group (+300%); 262 severe adverse events in the

vaccine cohort compared to 150 such events in the placebo group (+75%); and 127 serious

adverse events (defined as ER or hospitalizations) in the vaccine arm compared to 116 events

in the placebo arm (+10%).[28]

| Adverse Event | BNT162b2 (N$^a$=21,926) n$^b$ (%) | Placebo (N$^a$=21,921) n$^b$ (%) |
|---|---|---|
| Any event | 6617 (30.2) | 3048 (13.9) |
| Related$^c$ | 5241 (23.9) | 1311 (6.0) |
| Severe | 262 (1.2) | 150 (0.7) |
| Life-threatening | 21 (0.1) | 26 (0.1) |
| Any serious adverse event | 127 (0.6) | 116 (0.5) |
| Related$^{c,d}$ | 3 (0.0) | 0 |
| Severe | 71 (0.3) | 66 (0.3) |
| Life-threatening | 21 (0.1) | 26 (0.1) |
| Any adverse event leading to withdrawal | 32 (0.1) | 36 (0.2) |
| Related$^c$ | 13 (0.1) | 11 (0.1) |
| Severe | 10 (0.0) | 10 (0.0) |
| Life-threatening | 3 (0.0) | 7 (0.0) |
| Death | 3 (0.0) | 5 (0.0) |

**Table S3 | Participants Reporting at Least 1 Adverse Event from Dose 1 to 1 Month After Dose 2 During the Blinded Follow-up Period.** The population included all ≥16-year-old participants who received ≥1 dose of vaccine irrespective of follow-up time. a. N=number of

(discussing Thomas, Stephen, et al. (2021), Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine Through 6 Months, *The New England Journal of Medicine* (Sept. 15, 2021), https://pubmed.ncbi.nlm.nih.gov/34525277/)

[28].      Thomas, Stephen, et al. (2021), Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine Through 6 Months, *The New England Journal of Medicine* (Sept. 15, 2021), https://pubmed.ncbi.nlm.nih.gov/34525277/, Supp. Appendix, Table S3, https://www.nejm.org/doi/suppl/10.1056/NEJMoa2110345/suppl_file/nejmoa2110345_appe ndix.pdf

participants in the specified group. This value is the denominator for the percentage calculations. b. n=Number of participants reporting ≥1 occurrence of the specified event category. For 'any event', n=number of participants reporting ≥1 occurrence of any event. c. Assessed by the investigator as related to investigational product. d. Shoulder injury related to vaccine administration, right axillary lymphadenopathy, and paroxysmalventricular arrhythmia (as previously reported). Adverse events for 12–15-year-old participants werereported previously.[11]

71.    In an extraordinary departure from standard procedure, Pfizer unblinded its Phase 3 trial (NCT04368728) after two months by offering the BNT162b2 vaccine to everyone in the placebo group and thereby eliminating the control group of the trial. Perhaps most shocking, however, at the time of the unblinding there were more total deaths (15) in the vaccine group than in the placebo group (14).[29]

| Reported Cause of Death[a] | BNT162b2 (N=21,926) n | Placebo (N=21,921) n |
|---|---|---|
| Deaths | 15 | 14 |
| Acute respiratory failure | 0 | 1 |
| Aortic rupture | 0 | 1 |
| Arteriosclerosis | 2 | 0 |
| Biliary cancer metastatic | 0 | 1 |
| COVID-19 | 0 | 2 |
| COVID-19 pneumonia | 1 | 0 |
| Cardiac arrest | 4 | 1 |
| Cardiac failure congestive | 1 | 0 |
| Cardiorespiratory arrest | 1 | 1 |
| Chronic obstructive pulmonary disease | 1 | 0 |
| Death | 0 | 1 |
| Dementia | 0 | 1 |
| Emphysematous cholecystitis | 1 | 0 |
| Hemorrhagic stroke | 0 | 1 |
| Hypertensive heart disease | 1 | 0 |

_____

[29]    *Id.,* at Supp. Appendix. Table S4.

| | | |
|---|---|---|
| Lung cancer metastatic | 1 | 0 |
| Metastases to liver | 0 | 1 |
| Missing | 0 | 1 |
| Multiple organ dysfunction syndrome | 0 | 2 |
| Myocardial infarction | 0 | 2 |
| Overdose | 0 | 1 |
| Pneumonia | 0 | 2 |
| Sepsis | 1 | 0 |
| Septic shock | 1 | 0 |
| *Shigella* sepsis | 1 | 0 |
| Unevaluable event | 1 | 0 |

**Table S4 | Causes of Death from Dose 1 to Unblinding (Safety Population, ≥16 Years Old).** a. Multiple causes of death could be reported for each participant. There were no deaths among 12–15-year-old participants.

Furthermore, Pfizer reported an additional five (5) deaths amongst those individuals who took the BNT162b2 vaccine following the unblinding of the trial. Therefore, there were a total of Twenty (20) total deaths amongst people who took Pfizer's BNT162b2 vaccine, compared to only Fourteen (14) people who died in the placebo group.[30]

72.     The FDA relied upon this data in reaching its decision to grant licensure to the "Comirnaty" product.  The FDA's Clinical Review Memorandum, published in connection with Pfizer's Biologics License Application, also documented that Pfizer's Phase 3 trial (NCT04368728) evidenced a total of six (6) additional deaths amongst those individuals who took the vaccine following the unblinding period. Thus, the FDA's official records reflect a total of Twenty One (21) total deaths amongst the individual who received Pfizer's vaccine,

---

[30]     Thomas, Stephen, et al. (2021), Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine Through 6 Months. *The New England Journal of Medicine* (Sept. 15, 2021). https://pubmed.ncbi.nlm.nih.gov/34525277/.

compared to Seventeen (17) deaths amongst those who did not.[31]

73.    The Vaccine Adverse Event Reporting System (VAERS) data available while the Vaccine Mandate was in effect reveals unprecedented levels of deaths and other adverse events since the FDA issued Emergency Use Authorizations (EUAs) for three COVID-19 vaccines. By December 31, 2021, there were a total of 21,382 deaths associated with the COVID-19 vaccines. In the entire thirty-year history of VAERS prior to the rollout of the COVID-19 vaccines, there were a total of 9,254 deaths reported to VAERS for all other vaccines combine. This disparity is illustrated in the graph below.[32]



---

[31]    FDA, BLA Clinical Review Memorandum (May 18, 2021), p. 23 https://www.fda.gov/media/152256/download
[32]    VAERS Vaccine Adverse Event Reporting System data, available at https://vaers.hhs.gov ; https://openvaers.com

74.    In addition to the deaths reported with the COVID-19 vaccines described above, by December 31, 2021, there had been over ONE MILLION (1,016,999) adverse events reported to the VAERS system associated with the COVID-19, including 113,303 hospitalizations, 12,765 reports of bell's palsy, 10,863 heart attacks, 23,713 cases of myocarditis/pericarditis, and 36,758 permanent disabilities.[33]

### C.    The Vaccines Do Not Prevent Infection or Transmission of COVID-19

75.    When the mRNA vaccines were originally rolled out between December 2020 and January 2021, Pfizer reported that its BNT162b2 COVID-19 vaccine was "95% effective."[34] These claims were based upon its two month report of its Phase 3 trial published in the *New England Journal of Medicine*.[35] However, as shown below, Pfizer's claim as to the efficacy of the BNT162b2 vaccine was knowingly misleading because it was a statement of comparative risk reduction, rather than absolute risk reduction. The FDA's official position is that comparative risk reduction is misleading and recommends that claims about vaccine

---

[33]    *Id.*

[34]    *See e.g.*, Fox, Maggie, et al., Pfizer and BioNTech say final analysis shows coronavirus vaccine is 95% effective with no safety concerns, *CNN* (Nov. 18, 2020). https://www.cnn.com/2020/11/18/health/pfizer-coronavirus-vaccine-safety/index.html; Lovelace Jr., Berkley. Pfizer says final data analysis shows Covid vaccine is 95% effective, plans to submit to FDA in days, *CNBC* (Nov. 18, 2020), https://www.cnbc.com/2020/11/18/coronavirus-pfizer-vaccine-is-95percent-effective-plans-to-submit-to-fda-in-days.html

[35]    Thomas, Stephen, et al. (2020), Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine, *The New England Journal of Medicine* (Dec. 31, 2020). https://pubmed.ncbi.nlm.nih.gov/33301246/

efficacy be stated in terms of absolute risk reduction, rather than comparative risk reduction.[36]

76.     The data from Pfizer's clinical trials that was publicly available prior to Defendant implementing the Vaccine Mandate, showed that 162 out of 18,325 (.88%) of the individuals in the placebo group contracted COVID-19, versus 8 out of 18,198 (.04%) of the individuals in the vaccine group contracted COVID-19.

**Table 3. Vaccine Efficacy Overall and by Subgroup in Participants without Evidence of Infection before 7 Days after Dose 2.**

| Efficacy End-Point Subgroup | BNT162b2 (N=18,198) | | Placebo (N=18,325) | | Vaccine Efficacy, % (95% CI)† |
|---|---|---|---|---|---|
| | No. of Cases | Surveillance Time (No. at Risk)* | No. of Cases | Surveillance Time (No. at Risk)* | |
| Overall | 8 | 2.214 (17,411) | 162 | 2.222 (17,511) | 95.0 (90.0–97.9) |
| Age group | | | | | |
| 16 to 55 yr | 5 | 1.234 (9,897) | 114 | 1.239 (9,955) | 95.6 (89.4–98.6) |
| >55 yr | 3 | 0.980 (7,500) | 48 | 0.983 (7,543) | 93.7 (80.6–98.8) |
| ≥65 yr | 1 | 0.508 (3,848) | 19 | 0.511 (3,880) | 94.7 (66.7–99.9) |
| ≥75 yr | 0 | 0.102 (274) | 5 | 0.106 (785) | 100.0 (−13.1–100.0) |
| Sex | | | | | |
| Male | 3 | 1.124 (8,875) | 81 | 1.108 (8,762) | 96.4 (88.9–99.3) |
| Female | 5 | 1.090 (8,536) | 81 | 1.114 (8,749) | 93.7 (84.7–98.0) |
| Race or ethnic group‡ | | | | | |
| White | 7 | 1.889 (14,504) | 146 | 1.903 (14,670) | 95.2 (89.8–98.1) |
| Black or African American | 0 | 0.165 (1,502) | 7 | 0.164 (1,486) | 100.0 (31.2–100.0) |
| All others | 1 | 0.160 (1,405) | 9 | 0.155 (1,355) | 89.3 (22.6–99.8) |
| Hispanic or Latinx | 3 | 0.605 (4,764) | 53 | 0.600 (4,746) | 94.4 (82.7–98.9) |
| Non-Hispanic, non-Latinx | 5 | 1.596 (12,548) | 109 | 1.608 (12,661) | 95.4 (88.9–98.5) |
| Country | | | | | |
| Argentina | 1 | 0.351 (2,545) | 35 | 0.346 (2,521) | 97.2 (83.3–99.9) |
| Brazil | 1 | 0.119 (1,129) | 8 | 0.117 (1,121) | 87.7 (8.1–99.7) |
| United States | 6 | 1.732 (13,359) | 119 | 1.747 (13,506) | 94.9 (88.6–98.2) |

* Surveillance time is the total time in 1000 person-years for the given end point across all participants within each group at risk for the end point. The time period for Covid-19 case accrual is from 7 days after the second dose to the end of the surveillance period.
† The confidence interval (CI) for vaccine efficacy is derived according to the Clopper–Pearson method, adjusted for surveillance time.
‡ Race or ethnic group was reported by the participants. "All others" included the following categories: American Indian or Alaska Native, Asian, Native Hawaiian or other Pacific Islander, multiracial, and not reported.

Thus, Pfizer's own data demonstrates that its claim that its vaccine is "95% effective" refers to the relative risk of contracting COVID-19 in the vaccinated cohort compared to the

---

[36]     FDA, Fischhoff, *Communicating Risks and Benefits: An Evidence Based User's Guide* (2011), at pp. 59-60. https://www.fda.gov/media/81597/download

unvaccinated cohort.[37] The absolute risk reduction provided by Pfizer's BNT162b2 vaccine at the time is was mandated by the Defendant was only .84% (.0084).[38]

77.     The FDA relied upon this same data from Pfizer's Phase 3 clinical trials when it issued EUA 27034 for the BNT126b2, which was the only Pfizer COVID-19 Vaccine available the Plaitniff could take to comply with the Vaccine Mandate.[39]

78.     By the time the Defendants placed Ms. Langer on unpaid administrative leave on October 1, 2021, every public health agency, including the CDC and CT DPH, had publicly admitted that COVID-19 vaccines also do not stop transmission of COVID-19.

79.     By July 2021, "breakthrough infections" – the term coined by the CDC to describe when a person contracts COVID-19 after being vaccinated - had become so prevalent that the CDC had no choice but to publicly admit that the COVID-19 vaccines do not stop transmission of the SARS-CoV-2 virus.[40] In July 2021, CDC director Rochelle Wilensky admitted that "Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected

---

[37].    $VE = 100 * (1 - (.04\% / .88\%)) = 95\%$
[38].    $.88\% - .04\% = .84\%$
[39].    FDA, Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum (Pfizer) (Dec. 11, 2020), pp. 23-24, https://www.fda.gov/media/144416/download
[40].    CDC, Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021. https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm

with Delta can transmit the virus."[41]

80.     Then in September 2021, the FDA issued an EUA for a third "booster" dose of Pfizer's BNT162b2 vaccine because the antibodies created by the vaccine quickly disappear and therefore, the vaccine no longer provided protection against the Delta variant. [42]

81.     The CT DPH knew that the COVID-19 vaccines could not stop infection and transmission of COVID-19 as early as February 2021. In preparation for the COVID-19 vaccines to fail to prevent COVID-19 infections, the CT DPH issued a memorandum adopting the term "breakthrough infection," to classify a person who tests positive for COVID-19 after being "fully vaccinated" because the vaccines failed to prevent infection or transmission of COVID-19.[43]

82.     On December 15, 2021, Dr. Anthony Fauci admitted that the COVID-19 vaccines did not stop infection and transmission of COVID-19 in an article published in the New England Journal of Medicine, writing, that the vaccines "protective efficacy wanes over time, necessitating booster doses. Vaccination has also been unable to prevent 'breakthrough'

---

[41].    Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR (July 30, 2021), https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html
[42].    FDA, Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum, (Sept. 22, 2021), https://www.fda.gov/media/152432/download
[43].    CT DPH, COVID-19 Breakthrough Recommendations (Feb. 23, 2021), https://portal.ct.gov/-/media/DPH/HAI/COVID19-Vaccine-Breakthrough-Recommendations.pdf

TERK & CARLONE, LLC

infection, allowing subsequent transmission to other people…"[44]

83.     In fact, research funded by the National Institute of Health (NIH) and published in November of 2020, before the rollout of the mass vaccination program even began, warned that the COVID-19 vaccines would cause the SARS-CoV-2 virus to quickly mutate so that the virus evaded the protection provided by the vaccines:

> "Much like antimicrobial drug resistance, vaccine resistance can and does evolve. When it does evolve, vaccine resistance is achieved through mechanisms such as serotype replacement, antigen change, or increases in disease severity…. To our knowledge, all documented cases of vaccine resistance can be attributed to the absence of at least one of three key features that most vaccines possess: 1) the vaccine induces an immune response that protects hosts by targeting multiple virus epitopes simultaneously thereby generating redundant and evolutionarily-robust protection, 2) the vaccine suppresses pathogen growth [viral replication] within hosts and stops transmission from vaccine-protected hosts, and 3) the vaccine-induced immune response protects against all circulating serotypes of the target pathogen."[45]

The researchers concluded that the virus would evolve to develop resistance to COVID-19 vaccines because the COVID-19 fell into all three categories outlined above: (1) the COVID-19 vaccines only provide protection against a limited number of epitopes—specifically only those presented by the "spike protein" on the original Alpha (Wuhan) strain; (2) the COVID-19 vaccines do not stop viral replication or transmission of SARS-CoV-2; and (3) the vaccines do not protect against variants, namely the Delta and Omicron variants.

---

[44].     Fauci, Anthony, et al. (2021), Universal Coronavirus Vaccines— An Urgent Need, *The New England Journal of Medicine* (Dec. 15, 2021). https://www.nejm.org/doi/full/10.1056/NEJMp2118468

[45].     Kennedy, David, Read, Andrew, Monitor for COVID-19 Vaccine Resistance Evolution During Clinical Trials, *PLOS Biology*, Nov. 9, 2020. available at https://doi.org/10.1371/journal.pbio.3001000

TERK & CARLONE, LLC

84.     Another study funded by the National Institutes of Allergy and Infectious Diseases (NIAID) and published on April 8, 2021, found that the antibodies produced by the COVID-19 vaccines would lose their ability to provide protection against future variants of the virus because, as the virus evolves, the spike protein mutates to escape neutralization by antibodies generated by the COVID-19 vaccines.[46]

85.     Once it became impossible to deny that the COVID-19 mRNA vaccines could not prevent infection and transmission of the SARS-CoV-2 virus, the CDC changed the definition of "vaccine" so that it no longer required providing immunity to the infectious disease targeted by the drug.[47] On August 26, 2021, the CDC defined a "vaccine" as follows:

> **Vaccine:** A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease.[48]

However, by September 2, 2021, the CDC changed the definition of "vaccine" to be:

> **Vaccine:** A preparation that is used to stimulate the body's immune response against diseases.[49]

86.     Therefore, at the time the Defendant implemented the Vaccine Mandate, the

---

[46].    Eguia, Rachel, et al. (2021), A Human Coronavirus Evolves Antigenically to Escape Antibody Immunity, *PLOS Pathogens* (April 8, 2021), https://pubmed.ncbi.nlm.nih.gov/33831132/

[47].    The CDC defines "Immunity" as, "Protection from an infectious disease. If you are immune to a disease, you can be exposed to it without becoming infected."

[48].    FDA, Vaccine Basics (Aug. 26, 2021), https://web.archive.org/web/20210826113846/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm

[49].    FDA, Vaccine Basics (September 2, 2021), https://web.archive.org/web/20210902194040/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm

TERK & CARLONE, LLC

Defendant knew that the COVID-19 vaccines could not prevent infection or transmission of COVID-19.

**D.    Any Efficacy of the COVID19 Vaccines Disappears Within Months and Eventually Turns Negative**

87.    Months before the Vaccine Mandate went into effect clinical data demonstrated that the antibodies produced by the COVID-19 vaccines disappear within months of vaccination until the efficacy of the vaccines turns negative, thereby making the vaccinated more likely to contract COVID-19 than the unvaccinated.

88.    The reason is because the vaccines cause only the original "spike protein" to be presented to the immune system. This results in the body's immune system producing a very narrow spectrum of immunity limited to only variants of the virus that present the "spike protein" associated with the original (Alpha a/k/a Wuhan) strain. This is often referred to as "immune imprinting" or "original antigenic sin."[50]

89.    Findings from Pfizer's own clinical studies demonstrated that protection from the BNT162b2 vaccine substantially wanned within six months following receipt of the second dose correlating with the rise of the Delta variant, which became the predominate strain by July 2021, long before the Defendant implemented the Vaccine Mandate.[51]

90.    Independent studies have also consistently found that the antibodies produced by

---

[50]    Vatti, et al. (2017), Original Antigenic Sin: A comprehensive Review, *J. of Autoimmunity*, May 5, 2017, available at, https://pubmed.ncbi.nlm.nih.gov/28479213/
[51]    Tartof, Sara (2021), Effectiveness of mRNA BNT162b2 COVID-19 vaccine up to 6 months in a large integrated health system in the USA: a retrospective cohort study, *The Lancet* (Oct. 4, 2021), *available at* https://doi.org/10/1016/S0140-6736(21)02183-8

the COVID-19 vaccines will substantially wane over time.  For example, a study published on October 6, 2021 in the *New England Journal of Medicine* concluded that "six months after receipt of the second dose of the BNT162b2 [Pfizer-BioNTech] vaccine, the humoral response was substantially decreased, especially among men, among persons 65 years of age or older, and among persons with immunosuppression."[52]

91.     A similar study performed by scientists at Oxford University (England) found that the vaccine's ability to reduce transmission of the SARS-COV-2 virus "declined over time since second vaccination, for Delta reaching similar levels to unvaccinated individuals by 12 weeks" and that "protection from vaccination in contacts also declined in the 3 months after second vaccination." In other words, the vaccine's ability to prevent viral transmission disappeared complete in three months, and after this time, vaccinated individuals were just as likely to spread the virus as the unvaccinated. This correlated directly with an analogous reduction in the vaccine's ability to provide protection from infection.[53]

92.     Another study performed by researchers from Emory, Stanford and Wisconsin University found that the "data demonstrates a substantial waning of antibody responses and T-cell immunity to SARS-CoV-2 and its variants, at 6 months following the second immunization with the BNT162b2 vaccine." The researchers found that vaccines ability to

---

[52].     Levin, et al., Waning Immune Humoral Response to BNT162b2 COVID-19 Vaccine Over 6 Months, *New England Journal of Medicine*, Oct. 6, 2021, https://www.nejm.org/doi/full/10.1056/NEJMoa2114583
[53].     Eyre, David, et al. (2021), The Impact of SARS-CoV-2 vaccination on Alpha & Delta variant transmission. *medRxiv* preprint, *available at* https://www.medrxiv.org/content/10.1101/2021.09.28.21264260v1

provide protection against infection of SARS-CoV-2 virus began to decrease a mere two
months after the second dose of the BNT162b2 and mRNA-1273 [Moderna] vaccines.[54]

> "Concerns have been raised that declining neutralizing antibody titers or reduced
> effectiveness against symptomatic disease may herald significant declines in
> effectiveness against severe disease. The recent emergence of the highly
> transmissible Delta variant of SARS-CoV-2 resulted in a new wave of COVID-19
> cases in many parts of the world and has led to considerations for administration of
> booster doses to individuals who received primary series of vaccines in an effort to
> enhance immunity, and thus sustain protection from COVID-19…"

93.     The FDA approved a third or "booster" dose of the Moderna mRNA-1273
vaccine despite a dearth of evidence that the third "booster" dose provides any additional
benefit:[55]

> "Based on the data in the Hall et. al manuscript, the administration of a third dose of
> the Moderna COVID-19 vaccine appears to be only moderately effective in
> increasing antibody titers in the individuals studied. It is also unclear whether the
> antibodies generated from the third dose are protective and durable."

94.     Before the Vaccine Mandate went into effect, scientists from Harvard University
published a meta-analysis study investigating the relationship between the percentage of a
population fully vaccinated and new COVID-19 cases across 68 countries and across 2947
counties in the U.S. found that there is "no discernable relationship between population fully
vaccinated and new COVID-19 cases…." In fact, the only correlation found in the study was
that "countries with a higher percentage of population fully vaccinated have higher COVID-

---

[54]     Suthar, Mehul, et al. (2021), Durability of Immune Response to the BNT162b2
mRNA vaccine, *medRxiv* preprint, *available at*
https://www.medrxiv.org/content/10.1101/2021.09.30.462488
[55]     FDA, Decision Memorandum, Emergency Use Authorization (EUA) for Moderna
COVID-19 Vaccine (Aug. 12, 2021), https://www.fda.gov/media/151611/download

19 cases per [capita]." In other words, by September 30, 2021, data from around the world demonstrated that countries which have the highest percentage of their population vaccinated will have the most COVID-19 cases.[56]

95.     Once the "omicron" variant emerged in November 2021, studies discovered that the COVID-19 did not just fail to stop infection and transmission of the SARS-CoV-2 virus, but that they actually increased the likelihood of contracting and transmitting COVID-19.[57]

96.     A study published in December 2021 demonstrated that any protection from the Omicron variant provided by either the BNT162b2 or mRNA-1273 vaccine disappears completely within sixty days following vaccination. But even more shocking is that the study found that after ninety (90) days the vaccines have a negative efficacy against the "Omicron" variant. The study found the BNT162b2 (Pfizer) vaccines has an efficacy of -76.5%; and the mRNA-1273 (Moderna) had an efficacy of -39.3%.[58] In other words, this study found that people who were vaccinated were more likely to contract COVID-19 than those who were unvaccinated.

97.     A meta-analysis study analyzing data from around the world (145 Countries)

---

[56].     Subramanian & Kumar (2021), Increases in COVID-19 are unrelated to levels of vaccination across 68 Countries and 2947 Counties in the United States, *European Journal of Epidemiology* (Sept. 30, 2021), available at https://doi.org/10.1007/s10654-021-00808-7
[57].     CDC, Omicron Variant: What you Need to Know, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html
[58].     Hansen, et al. (2021), Vaccine effectiveness against SARS-CoV-2 infection with the Omicron or Delta variants following a two-dose or booster BNT162b2 or mRNA-1273 vaccination series: A Danish cohort Study (Dec. 20, 2021), *medRxiv* preprint, available at https://www.medrxiv.org/content/10.1101/2021.12.20.21267966v2

found that the COVID-19 mRNA vaccines "cause more COVID-19 associated cases and deaths than otherwise would have existed with zero vaccines. Consequently, these experimental gene therapy injections known as COVID-19 vaccines cannot be mandated by any public policy that intends to continue following the regulations of the Nuremberg Code, the Helsinki Accord, and the Human Rights Declaration on Bioethics."[59]

98.     Although it may seem impossible that vaccines could actually increase the risk of contracting the disease they were developed to prevent, these COVID-19 vaccines are not the first time that negative vaccine efficacy has been observed. For example, in February 2020, the NIAID had to suddenly halt Phase 3 clinical trials of its most promising HIV vaccine when the NIAID realized that the vaccines were *raising* the risk of AIDS in the vaccinated individuals.[60]

99.     These studies finding that efficacy of the COVID-19 vaccines become negative when confronted with the "Omicron" variant perfectly explains why COVID-19 cases exploded in Connecticut during the time the Vaccine Mandate was in effect, as illustrated by

---

[59]     Beattie, Kyle (2021), Worldwide Bayesian Causal Impact Analysis of Vaccine Administration on Deaths and Cases Associated with COVID-19:A BigData Analysis of 145 Countries (Nov. 15, 2021). *Research Gate* (DOI:10.13140/RG.2.2.34214.65605), available at https://www.researchgate.net/publication/356248984_Worldwide_Bayesian_Causal_Impact_Analysis_of_Vaccine_Administration_on_Deaths_and_Cases_Associated_with_COVID-19_A_BigData_Analysis_of_145_Countries

[60]     Kennedy Jr,. Robert F. (2021), THE REAL ANTHONY FAUCI: BILL GATES, BIG PHARMA, AND THE GLOBAL WAR ON DEMOCRACY AND PUBLIC HEALTH (Kindle Ed.), Skyhorse Publishing. p.623 (citing Julie Steenhuyesen, "Trial of Promising HIV Vaccine Halted after Failing to Show Benefit," Reuters (Feb. 3, 2020). https://www.reuters.com/article/us-health-hiv-vaccine-idUSKBN1ZX2QO)

the graph below of all COVID-19 cases in Connecticut since the beginning of the pandemic in March 2020.[61]



COVID-19 Cases (Mar. 25, 2020 - Jan. 7, 2022)

### E.  The COVID-19 Tests Are Being Administered Under Emergency Use Authorization and Are Inherently Unreliable

100.    The CT DPH adopted the polymerase chain reaction (PCR) tests as the primary diagnostic tool for identifying a COVID-19 infection.[62]

---

[61]     CT DPH, COVID-19 Tests, Cases Hospitalizations, and Deaths, https://data.ct.gov/Health-and-Human-Services/COVID-19-Tests-Cases-Hospitalizations-and-Deaths-S/rf3k-f8fg

[62]     CT DPH, Where do I go to get tested for COVID-19? How do I know If I should be tested? (July 2. 2020), *available at* https://portal.ct.gov/Coronavirus/Covid-19-Knowledge-Base/COVID-19-Testing:

101.    Invented by Nobel laureate Kary Mullis in 1983, PCR technology amplifies selected pieces of DNA by using primers that target a sequence of nucleotides; once the primers locate the targeted genomic sequence the polymerase enzyme creates copies of the DNA sequence targeted by the primers. "At the end of this process, the total amount of target DNA will have doubled; and the whole process can be repeated again; each cycle results in a doubling of the target region." The number of cycles utilized is called the cycle threshold (Ct) count.[63]

102.    Therefore, the accuracy of a positive PCR test, which is used as a proxy for an active COVID-19 infection, is entirely dependent on:

   (i)    The cycle threshold (Ct) count used; and

   (ii)    The primers utilized by the PCR test

However, as described below, these fundamental features of the PCR tests are easily manipulatable, and have been manipulated by the Defendants for purely political purposes.

103.    Because the PCR test exponentially increases the amount of target DNA with each additional cycle count, the accuracy of a positive tests decreases exponentially with each additional cycle such that a cycle threshold (Ct) count above a 28 is effectively meaningless; a fact reported by the *New York Times* in August 2020.[64]

---

[63]     Watson. James, DNA: THE STORY OF THE GENETIC REVOLUTION (Kindle), Alfred A Knopft (2017). pp. 171-172; Flint, Jane, et al., PRINCIPLES OF VIROLOGY. VOL. 1: MOLECULAR BIOLOGY (Kindle, 5th Edition 2020). ASM Press. p. 45
[64]     CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel-Instruction for Use. p. 34, https://www.fda.gov/media/134922/download; Mandavilli.

104.    Without knowing the cycle threshold (Ct) count associated with each positive COVID-19 test, it is impossible to evaluate the validity of the positive test results reported by the CT DPH. However, the CT DPH does not report the cycle threshold (Ct) count associated with each positive case that is reported, nor are they currently required to under Connecticut law.[65]

105.    Both the CDC and the FDA admit that the PCR tests do not just detect the presence of the SARS-CoV-2 (COVID-19) virus, but also detect the presence many types of bacteria and other viruses such as influenza and the common cold.[66]

106.    In fact, when the FDA approved the PCR tests for emergency use in detecting the SARS-CoV-2 virus, the FDA explicitly stated that the PCR test "cannot rule out diseases caused by other bacterial or viral pathogens."[67]

107.    This is because the United States government has never had an isolated sample of the SARS-CoV-2 virus to use in creating the primers for the PCR tests. Instead, the primers of the PCR test were created using the genomic sequences of different coronaviruses that had

Approva, Your Coronavirus Test Is Positive. Maybe It Shouldn't Be. *NY Times* (Aug. 29, 2020), https://www.nytimes.com/2020/08/29/health/coronavirus-testing.html
[65]    CT DPH, Reporting SARS-CoV-2 (COVID-19) Test Results and Cases: Guidance for Laboratories, Point of Care Providers, and Others, https://portal.ct.gov/-/media/DPH/HAI/COVID19-Test-Reporting_092020V11.pdf;
Connecticut General Assembly (Jan. Session 2021), Proposed Bill No. 6023, An Act Concerning Cycle Threshold Values in Polymerase Chain Reaction Test Results for COVID-19. https://www.cga.ct.gov/2021/TOB/H/PDF/2021HB-06023-R00-HB.PDF
[66]    CDC, Diagnostic Tests for COVID-19, last updated Aug. 7, 2021, available at https://www.cdc.gov/coronavirus/2019-ncov/lab/testing.html
[67]    CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel-Instruction for Use, p. 38, https://www.fda.gov/media/134922/download

TERK & CARLONE, LLC

been previously isolated, sequenced and published in GenBank,[68] the NIH's public archive of

genomic sequences for all known viruses:

> "**Since no quantified virus isolates of the 2019-nCoV were available for CDC**
> **use at the time the test was developed** and this study conducted, assays designed
> for detection of the 2019-nCoV RNA were tested with characterized stocks of in
> vitro transcribed full length RNA (N gene; GenBank accession: MN908947.2) of
> known titer (RNA copies/µL) spiked into a diluent consisting of a suspension of
> human A549 cells and viral transport medium (VTM) to mimic clinical specimen."
> [69]

108.    In other words, the PCR test uses primers to detect the genomic sequence of the

SARS-CoV-2 virus, but the primers were not created based upon the genomic sequence of the

SARS-CoV-2 virus itself. Instead, the primers were designed based on speculation as to what

the genomic sequence of the SARS-CoV-2 virus might be.

109.    The FDA also readily acknowledges that the accuracy of the PCR tests becomes

even less reliable as time passes and the virus mutates:

> "If the virus mutates in the rRT-PCR [primer] target region, 2019-nCoV may not
> be detected or may be detected less predictably. The clinical performance has not
> been established in all circulating variants but is anticipated to be reflective of the
> prevalent variants in circulation at the time and location of the clinical evaluation.
> Performance at the time of testing may vary depending on the variants circulating,
> including newly emerging strains of SARSCoV-2 and their prevalence, which
> change over time."[70]

---

[68].     NIH. GenBank Overview, https://www.ncbi.nlm.nih.gov/genbank/
[69].     CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel-
Instruction for Use, p. 41. https://www.fda.gov/media/134922/download
[70].     *Id.* at p. 37

TERK & CARLONE, LLC

110.   On July 21, 2021, the CDC issued notice that it was withdrawing its EUA for use of the PCR test to detect COVID-19, effective December 31, 2021, citing the inability of the PCR test to differentiate between the SARS-CoV-2 and the influenza virus. [71]

111.   On July 20, 2020 it was discovered that 90 out of 144 people – or sixty-three percent (63%) - tested for COVID-19 between June 15 and July 17, 2020 received a false positive COVID test.[72]

112.   Because the PCR tests cannot differentiate the presence of SARS-CoV-2 virus from any other respiratory virus, the epidemiological curve of COVID-19, for the first 16 months following the public health emergency, follows the pattern of every other respiratory virus:[73]

---

[71].   CDC, 07/21/2021: Lab Alert: Changes to CDC RT-PCR for SARS-CoV-2 Testing, https://www.cdc.gov/csels/dls/locs/2021/07-21-2021-lab-alert-Changes_CDC_RT-PCR_SARS-CoV-2_Testing_1.html

[72].   Ceneviva, Alex, State Public Health Lab discovers false-positive COVID-19 test results (July 20, 2020), *CT News8*, https://www.wtnh.com/news/health/coronavirus/state-public-health-lab-discovered-false-positive-covid-19-test-results/#/questions

[73].   Connecticut Department of Health, COVID-19 Tests, Cases Hospitalizations, and Deaths, https://data.ct.gov/Health-and-Human-Services/COVID-19-Tests-Cases-Hospitalizations-and-Deaths-S/rf3k-f8fg



113.    The graph above illustrates that COVID-19 cases spike between the months of November and February—commonly known as cold and flu season. Because respiratory viruses of all kinds are most prevalent in Connecticut during cold and flu season between November and February, and the PCR test cannot differentiate between SARS-CoV-2, influenza, or other coronavirus, a seasonal spike in COVID-19 cases would be excepted during the time of year that respiratory viruses are ubiquitous.

114.    The graph above also evidences that COVID-19 is effectively non-existent during the during the spring and summer: This is consistent with findings of numerous studies demonstrating that heat, humidity and ultraviolet (UV) light, are very effective at killing COVID-19.[74]

---

[74].    Ma, Yiqun (2021), Role of Meteorological Factors in the Transmission of SARS-CoV-2 in the United States. *Nature Communications* (June 14, 2021).

115.    The seasonality of COVID-19 is also a result of decreased Vitamin D levels during the winter months. Vitamin D is critical to preventing COVID-19 infections and is naturally produced with skin exposure to sunlight. Vitamin D levels are lowest during the winter when days are shortest, and people spend the most time indoors.[75] Consequently, Connecticut residents are more likely to test positive for COVID-19 during the winter months when Vitamin D levels among the population are at their lowest.

116.    Moreover, the vast majority of COVID-19 transmission occurs in the household as opposed to public settings.[76] This further establishes that the Defendants' claim that the workplace poses a high risk for transmission of COVID-19 is entirely false.

117.    The data published by the CT DPH demonstrates that COVID-19 associated deaths have followed the same seasonal pattern:[77]

---

https://www.nature.com/articles/s41467-021-23866-7
[75].    *See e.g.*, Ghelani, Drishti, et al. (2021), Vitamin D and COVID-19: An Overview of Recent Evidence, *Int. J. of Mol. Science* (Oct. 22, 2021), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8509048/
[76].    Madewell, Zachary, et al. (2020), Household Transmission of SARS-CoV-2: A Systematic Review and Meta-analysis, *Journal American Medical Association* (Dec. 14, 2020, available at https://pubmed.ncbi.nlm.nih.gov/33315116/; Lewis, Nathaniel, et al. (2020), Household Transmission of Severe Acute Respiratory Syndrome Coronavirus-2 in the United States, *Clinical Infectious Disease* Vol. 73 (7), (Oct. 1, 2021), available at https://pubmed.ncbi.nlm.nih.gov/33185244/
[77].    Connecticut Department of Health, COVID-19 Tests, Cases Hospitalizations, and Deaths, https://data.ct.gov/Health-and-Human-Services/COVID-19-Tests-Cases-Hospitalizations-and-Deaths-S/rf3k-f8fg



Daily COVID-19 Deaths (Confirmed & Probable)

118.    Because the COVID-19 PCR tests will detect any number of different viral pathogens such as flu, pneumonia and any other known coronavirus, including the common cold, a positive test result indicates the presence of *a virus*, it does not indicate *which type of virus* is present. In other words, a positive test result may indicate that the PCR test detected the presence of flu or pneumonia, not COVID-19.

**F. Plaintiff's Constitutionally Protected Right to Bodily Autonomy Was Violated**

119.    The Defendants' Vaccine Mandate, including the mandatory testing provision, violates the Plaintiff's right to bodily autonomy, informed consent, and equal protection guaranteed under Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitutional Provisions because it is designed coerce the Plaintiff to receive an experimental gene therapy, under threat of loss of employment.

120.   There is no scientific, evidentiary, or medical justification for requiring the Plaintiff's to receive a COVID-19 vaccine, or submit to weekly testing if an exemption is obtained, because:

- The vaccines do not prevent infection from COVID-19

- The vaccines do not prevent transmission of COVID-19

- The COVID-19 vaccines have negative efficacy against the Omicron variant and therefore increase your chance getting sick

- The COVID-19 vaccines are the most dangerous vaccines ever administered to the public, causing more deaths and severe adverse events than every other previous vaccine combined.

- Vaccinated employees are more likely be infected with COVID-19 but are not required to submit to weekly testing

121.   Moreover, the mandatory testing provision of the Vaccine Mandate, requiring the unvaccinated Plaintiff to submit to weekly testing, while exempting her vaccinated co-workers even though they are more likely to contract and transmit COVID-19, violates the equal protection clause of the Fourteenth Amendment because it is unscientific, arbitrary and discriminatory.

122.   The Supreme Court of the United States has long recognized that "no right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment." See e.g.. *Cruzan by Cruzan v. Director, Missouri Department*

*of Health*, 497 U.S. 261 (1990) (citing *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

123.    The Fifth Amendment, made applicable to the States through the Fourteenth Amendment provides that private property shall not be taken for public use, without just compensation. *Phillips v. Washington Legal Foundation*, 524, U.S. 156, 163-164 (1998). A competent person has a liberty interest under the Due Process Clause which includes the right to informed consent and in refusing unwanted medical treatment. *Cruzan by Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990).

124.    Under the Fourth Amendment, incorporated through the Fourteenth Amendment, competent individuals have a right to privacy which includes the fundamental liberty interest in bodily autonomy and to be free from restraint and intrusion on that bodily autonomy by the State. *See e.g., Schmerber v. California*, 384 U.S. 757, 772 (1966); *Washington v. Harper*, 494 U.S. 210, 221 (1990); *Parham v. J.R.*, 442 U.S. 584, 600 (1979).

125.    As a direct result and consequence of the Defendants actions the Plaintiff has suffered monetary damages, including, but not limited to, lost wages.

126.    42 U.S.C. §1983 creates a private cause of action for individuals to remedy constitutional violations of civil rights. The statute is derived from §1 of the Civil Rights Act of 1871, 17 Stat. 13 and it was intended to create "a species of tort liability" in favor of persons deprived of federally secured rights. *Carey v. Piphus*. 435 U.S. 247, 253 (1978).

127.    The Defendant cannot obfuscate its liability for violating the Plaintiff's Constitutional rights by claiming they were merely acting upon Governor Lamont's Vaccine

Mandate, set forth in Executive Order 13D and amended by Executive Order 13G, because the Governor's Executive Orders were illegal on their face for the following reasons:

       (A)    The Plaintiff could only comply with the Vaccine Mandate by taking an experimental drug, and in fact, EO 13D stated that the COVID-19 vaccines were being administered under Emergency Use Authorization;

       (B)    The statutory authority to issue a vaccine mandate under C.G.S. §19a-131e is expressly limited to the commissioner of public health, rather than the Governor;

       (C)    The governing statute, C.G.S. §19a-131e, does not authorize the issuance of a mandatory vaccination order based upon vocation or occupation. Rather, the statute expressly limits the authority to issue mandatory vaccination orders to "such individuals or individuals present within a geographic area;"

       (D)    The governing statute, C.G.S. §19a-131e explicitly limits any mandatory vaccination order to only those individuals the "commissioner deems reasonable and necessary in order to prevent the introduction or arrest the progress of the communicable disease or contamination that caused the declaration of such public health emergency," but COVID-19 vaccines do not satisfy this condition because they do not prevent infection or transmission of COVID-19.

TERK & CARLONE, LLC
81 WOLCOTT HILL ROAD · WETHERSFIELD, CT 06109 · (860) 563-9494 · FAX (860) 563-6088 · JURIS NO. 434408

WHEREFORE, the Plaintiff prays for the following relief:

1.  Monetary damages;

2.  Attorney's Fees

4.  Costs;

5.  Such other relief as equity may pertain.

PLAINTIFF,
CATHERINE LANGER

By: _____
     Matthew S. Carlone
     Terk & Carlone, LLC
     81 Wolcott Hill Road
     Wethersfield, CT 06109
     Juris No. 434408
     Her Attorneys

A TRUE COPY ATTEST

KEITH D. NIZIANKIEWICZ
CONNECTICUT STATE MARSHAL
INDIFFERENT PERSON

| RETURN DATE: NOVEMBER 22, 2022 | : | SUPERIOR COURT |
|---|---|---|
| CATHERINE LANGER | : | J.D. OF LITCHFIELD |
| v. | : | AT TORRINGTON |
| HARTLAND BOARD OF EDUCATION | : | OCTOBER 19, 2022 |

## STATEMENT OF AMOUNT IN DEMAND

The amount in demand, exclusive of costs and interest, is greater than $15,000.00.

PLAINTIFF,
CATHERINE LANGER

By
    Matthew S. Carlone
    Terk & Carlone, LLC
    81 Wolcott Hill Road
    Wethersfield, CT 06109
    Juris No. 434408

A TRUE COPY ATTEST

KEITH D. NIZIANKIEWICZ
CONNECTICUT STATE MARSHAL
INDIFFERENT PERSON

EXHIBIT A

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Catherine Langer
**COMPLAINANT**

CHRO No. 2230240
EEOC No. 16A202200214

vs.

Hartland Board of Education
**RESPONDENT**

<u>RELEASE OF JURISDICTION</u>

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

<u>The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.</u>

**DATE:**   August 17, 2022

Tanya A. Hughes, Executive Director

Service:
Complainant: catherine2langer@gmail.com
Complainant's attorney: mcarlone@terkcarlone.com
Respondent: Hartland Board of Education
Respondent's attorney: jzelman@fordharrison.com; msommaruga@pullcom.com

EXHIBIT 

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Catherine Langer
**COMPLAINANT**

vs.

CHRO No. 2330005
EEOC No. 16A202200969

Hartland Board of Education
**RESPONDENT**

RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

**DATE:**   August 17, 2022

Tanya A. Hughes, Executive Director

Service:
Complainant: catherine2langer@gmail.com
Complainant's attorney: mcarlone@terkcarlone.com
Respondent: Hartland Board of Education
Respondent's attorney: jzelman@fordharrison.com; msommaruga@pullcom.com

**EXHIBIT** 

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

New York District Office
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

### DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 09/06/2022

To: Catherine Langer
19 Carriage Lane
Barkhamsted, CT 06063

Charge No: 16A-2022-00214

EEOC Representative and email:    Amon Kinsey
Supervisory Investigator
amon.kinsey@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC is closing this charge because: Charging Party is pursuing claims in another forum.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission;

Digitally Signed By Timothy Riera
09/06/2022

Timothy Riera
Acting District Director

EXHIBIT ____

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

New York District Office
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website  www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 08/26/2022

To: Catherine Langer
19 Carriage Lane P.O.BOX 317
Barkhamsted, CT 06063

Charge No: 16A-2022-00969

EEOC Representative and email:    Amon Kinsey
Supervisory Investigator
amon.kinsey@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC is closing this charge because: Charging Party is pursuing claims in another forum.

The EEOC has adopted the findings of the state or local fair employment practices agency that investigated your charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS** of your receipt of this notice. Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By Timothy Riera
08/26/2022
Timothy Riera
Acting District Director