## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CATHERINE LANGER,
     *Plaintiff*,

    v.                                        No. 3:22-cv-01459 (JAM)

HARTLAND BOARD OF EDUCATION,
     *Defendant*.

### RULING ON MOTION TO DISMISS

The plaintiff Catherine Langer used to teach the second grade at a public elementary school in the small town of Hartland, Connecticut. This lawsuit against the defendant Hartland Board of Education stems from an emergency order issued by the Governor of Connecticut that, for a time, required schoolteachers like Langer to receive the COVID-19 vaccine or to be regularly tested for COVID-19.

Langer alleges that she had a religious objection to complying with this vaccinate-or-test requirement and that the Board violated her statutory rights to be free from religious discrimination by placing her on unpaid administrative leave and ultimately terminating her employment. She further alleges that the Board violated her constitutional rights to bodily autonomy, medical privacy, and equal protection by requiring her to submit to the state-mandated vaccinate-or-test requirement.

The Board has now moved to dismiss the complaint. I will deny the motion as to Langer's statutory claims but will grant the motion as to Langer's constitutional claims.

### BACKGROUND

According to the amended complaint, Langer taught in the Hartland public school system for 13 years.[1] In September 2021, Connecticut Governor Ned Lamont issued an emergency

---

[1] Doc. #15 at 1 (¶¶ 1–3).

executive order—Executive Order 13G—which in essence imposed a COVID-19 vaccinate-or-test requirement for Connecticut public school teachers.[2] That is, the order required school teachers either to be vaccinated against COVID-19 or, if they received a religious or medical exemption from the vaccination requirement, to be tested on a weekly basis for COVID-19.[3] The order did not allow for any religious or medical exemption from the testing requirement.[4]

The order required school boards to "implement a policy that requires … covered workers [including school teachers] who have not demonstrated proof of full vaccination to submit to COVID-19 testing not less than once per week on an ongoing basis until fully vaccinated."[5] The order also provided that a teacher "shall not be allowed on [school property] until the individual provides adequate proof of compliance [with the vaccination or testing requirements] or without prior written authorization of the covered … school board[.]"[6] And the order emphasized that a school board "shall be in violation of this order when it permits a covered worker who has not complied with this order to be [on school property]."[7] The sanction for failing to follow the Governor's order included potentially forfeiting a portion of state funding.[8]

Connecticut published corresponding implementation guidance for Executive Order 13G that explained the order's requirements and provided templates for employees to request medical or religious exemptions.[9] That guidance noted that even covered workers who received a

---

[2] A copy of the order is part of the record, Doc. #18-2, and it is available on the Governor's website, https://portal.ct.gov/Office-of-the-Governor/Governors-Actions/Executive-Orders/Governor-Lamonts-Executive-Orders (last accessed Sept. 18, 2023).
[3] Doc. #18-2 at 8–9 (¶ 3(c)(i)).
[4] *Id.* at 9 (¶ 3(c)(ii)).
[5] *Id.* at 11 (¶ 4(b)(i)).
[6] *Id.* at 12 (¶ 8(a)).
[7] *Id.* at 12-13 (¶ 8(b)).
[8] *Id.* at 13 (¶ 8(c)).
[9] *See* Doc. #18-5 (Implementation Guidance for Executive Order 13G, dated September 17, 2021).

religious exemption from the COVID-19 vaccine requirement "must comply with the [COVID-19] testing requirements" in order to access school property.[10]

The Hartland Board of Education implemented the Governor's order in September 2021, which prompted Langer to request a religious exemption from both the vaccine mandate and the weekly testing requirement.[11] The Superintendent of Hartland public schools, Imma Canelli, granted the request as to the vaccination mandate but denied it with respect to the weekly testing requirement.[12] Langer appealed the denial and proposed that she teach from home as a possible reasonable accommodation.[13] The Board denied both the appeal and Langer's proposed accommodation.[14]

Langer then met with the school principal and Canelli at the end of September.[15] She explained how both the vaccination and testing requirements "violated her religious beliefs."[16]

The Board soon placed Langer on unpaid administrative leave for failing to comply with the vaccinate-or-test requirement.[17] Langer filed a religious discrimination complaint on November 5, 2021 with the Connecticut Commission on Human Rights and Opportunities ("CHRO").[18]

---

[10] *Id.* at 8 (Section IV.C).
[11] Doc. #15 at 3 (¶¶ 9–10).
[12] *See ibid.* (¶ 10). The Board states in its briefing that it "granted Plaintiff's religious exemption [to the COVID-19 vaccine] despite its suspect nature." Doc. #18-1 at 2. The Board confirmed that it did so at oral argument, and Langer's counsel did not contest this representation. Unfortunately, it is unclear whether Langer alleges the Board granted it in the amended complaint. *See* Doc. #15 at 3 (¶ 10) ("On or about September 24, 2021, Ms. Langer submitted a religious exemption request for the vaccine, as well as an exemption to weekly testing, to the Superintendent of schools, Imma Canelli, but the exemption request was denied that same day."). But it is not dispositive to my analysis because the pertinent issue in this case is Langer's religious objection to the weekly testing requirement.
[13] *Ibid.* (¶¶ 11–12).
[14] *Ibid.* (¶ 13).
[15] *Id.* at 4 (¶ 15).
[16] *Ibid.*
[17] *Ibid.* (¶¶ 16–20).
[18] *Id.* at 8 (¶ 41).

The Governor's order expired on February 15, 2022.[19] Canelli contacted Langer on February 14 to request a meeting on February 16 to discuss Langer's return to the classroom.[20] During the meeting, Canelli indicated that she wanted to "ease" Langer back into teaching following her extended absence.[21] Following that meeting, however, Langer asked to take personal leave for the remainder of the school year, stating in an email to Canelli on February 24, 2022 that "if I was to return now, it would disrupt the schedule and routines that the second-graders have depended on for the past 5 months."[22]

Canelli promptly responded that she would raise this concern with the Board.[23] Nearly three weeks later, Canelli emailed Langer on March 15, 2022 to advise her that the Board had voted the day before to deny her request for personal leave, and Canelli then instructed Langer to report to Canelli's office to resume work on March 17, 2022.[24]

Langer replied the next day by email stating that she could not return to work on March 17 because "I was forced to take on other employment due to Hartland placing me on unpaid administrative leave" and because "[m]y current obligations do not allow me the flexibility to return until June 17, 2022."[25] Although Langer's prior email requesting personal leave for the rest of the school year had cited only the best interests of her students (without mention of any other employment responsibilities), Langer alleges in her complaint that the Board knew she

---

[19] Doc. #18-3 at 5 (Exh. B) (Exec. Order 14).

[20] Doc. #15 at 5 (¶ 23).

[21] *Ibid.* (¶ 24). Langer's opposition to the motion to dismiss improperly tries to expand the record by reciting numerous additional facts that do not appear in the complaint or in documents integral to complaint. For example, it alleges that Langer told Canelli that she must give two-weeks notice to her current employer before returning to work at school. Doc. #24 at 3. If true, this add-on fact is damaging to Langer's case because it is inconsistent with her later writing to Canelli that her competing employment obligations would not allow her to return to teaching until June 17, 2022 at the earliest. Doc. #18-14 at 2 (Exh. M).

[22] *Ibid.* (¶ 25); Doc. #18-12 at 2 (Exh. K).

[23] *Ibid.* (¶ 26).

[24] *Id.* at 5–6 (¶ 27); Doc. #18-14 at 2 (Exh. M).

[25] *Id.* at 6 (¶ 31); Doc. #18-14 at 2 (Exh. M).

could not return because "at the February 16th meeting, Ms. Langer explained to Ms. Canelli that she was forced to take on other employment obligations as a consequence of being placed on unpaid administrative leave on October 1, 202[1], in order to make ends meet."[26]

On March 17, 2022, Canelli sent an email to Langer with a formal letter stating that "[w]e are considering your refusal to come to work as an abandonment and/or irrevocable resignation from your employment" and that "[a]s such, the Hartland School District accepts your resignation, effective March 17, 2022."[27] Langer alleges that the Board "fired" her and that "the denial of Ms. Langer's request for personal leave and subsequent demand to return to work within 48 hours, knowing that Ms. Langer could not meet this demand, was done in retaliation for refusing to compromise her religious beliefs."[28]

The CHRO released jurisdiction in August 2022.[29] Langer then filed this lawsuit for money damages in November 2022.[30] Counts One and Two allege employment discrimination claims under both the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*[31] Count Three alleges a mix of federal constitutional claims under the Fourth, Fifth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 based on alleged violations of Langer's

---

[26] *Ibid.* (¶ 28); *see also* Doc. #18-15 at 2 (Exh. N) (email from Langer to Canelli on March 20, 2022 stating that "[i]n our meeting on February 16, 2022 I informed you that I had to take on other work. I also informed you that I would need to look into the date when I could return to Hartland School.").

[27] *Id.* at 7 (¶¶ 34-35); *see also* Doc. #18-16 at 2 (Exh. O) (letter from Canelli to Langer). The Board has attached to its opposition to the motion to dismiss a copy of the letter that is cited by Langer in her complaint. *Ibid.* I accept the letter insofar as it substantiates that a letter was sent and that reasons were stated by Canelli for considering Langer to have abandoned and/or resigned from her employment. At the pleadings stage, however, I decline to credit *as true* Canelli's reasons to the extent that they have not been acknowledged or conceded as true by Langer.

[28] *Id.* at 7, 8, 9 (¶¶ 36, 38 duplicatively numbered).

[29] *Id.* at 8 (¶¶ 43–44), 47–48 (Releases of Jurisdiction, both dated August 17, 2022). Langer filed a retaliation claim with the CHRO in July 2022. *Id.* at 8 (¶ 42).

[30] Docs. #1, #15.

[31] Doc. #15 at 1–8 (¶¶ 1–44) (Count One, CFEPA), 9–10 (¶¶ 37–44) (Count Two, Title VII).

right to bodily autonomy, medical privacy, and equal protection stemming from the vaccinate-or-test requirement.[32]

The Board moves to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[33] As to Counts One and Two, it argues that Langer fails to state plausible employment discrimination claims.[34] As to Count Three, it argues that Langer has no standing, that the Board has Eleventh Amendment immunity, and that Langer's constitutional claims fail on their merits.[35]

## DISCUSSION

The standard that governs a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is well established. A complaint may not survive unless it alleges facts that, taken as true, give rise to plausible grounds to sustain the Court's subject-matter jurisdiction as well as the plaintiff's grounds for relief. *See Brownback v. King*, 141 S. Ct. 740, 749 (2021); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[36] "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

"Although allegations that are conclusory are not entitled to be assumed true, when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Lynch v. City of New York*, 952 F.3d

---

[32] *Id.* at 10–43 (¶¶ 36–121) (Count Three, § 1983). The complaint also asserted an additional claim (Count Four) under Conn. Gen. Stat. § 53-37b (deprivation of a person's equal rights and privileges by force or threat), which is a state criminal statute, but Langer advised at oral argument that she has abandoned this claim.

[33] Doc. #18.

[34] Doc. #18-1 at 29–36.

[35] *Id.* at 15–29.

[36] Unless otherwise indicated, this ruling for ease of reading omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

67, 75 (2d Cir. 2020). "The court must also construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Ibid.*

Here, the Board has opposed Langer's motion to dismiss by means of filing copies of numerous written communications between Langer and Canelli that are referenced in the complaint. A court may consider such extrinsic documents to the extent that they are incorporated by or otherwise integral to the complaint and provided that there is no dispute about the authenticity or accuracy of the document. *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

### Employment discrimination claims (Counts One and Two)

Langer brings her employment discrimination claims under both CFEPA and Title VII.[37] Both CFEPA and Title VII generally provide equivalent protections for employees and are analyzed under a similar legal framework. *See Cutler v. Stop & Shop Supermarket Co.*, 513 F. App'x 81, 82 (2d Cir. 2013); *Martinez v. Premier Maint., Inc.*, 185 Conn. App. 425, 436 (2018).[38]

Complaints of employment discrimination often advance different theories, including disparate treatment, retaliation, and failure-to-accommodate. *See, e.g., Dawson v. Sec. Servs. of Connecticut Inc.*, 2022 WL 17477601, at *4 (D. Conn. 2022). Because these theories have different elements, it is important for plaintiffs to make clear the theories on which they rely. At oral argument, plaintiff's counsel clarified that Langer pursues only two theories of employment

---

[37] Doc. #15 at 1–10.

[38] Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, provides that "[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual … because of such individual's … religion." § 2000e-2(a)(1). "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." § 2000e(j). CFEPA provides that "[i]t shall be a discriminatory practice … [f]or an employer … to discriminate against any individual … because of the individual's … religious creed." Conn. Gen. Stat. § 46a-60(b)(1).

discrimination. First, she alleges that Hartland failed to accommodate her religion. Second, she

alleges that Hartland retaliated against her because of her complaints that Hartland had failed to

accommodate her religion. She does not otherwise pursue a disparate treatment theory of

discrimination.

As an initial matter, the Board argues that I should apply the *McDonnell Douglas* burden-

shifting framework to Langer's statutory discrimination claims.[39] That is not correct. The

*McDonnell Douglas* burden-shifting framework applies to the analysis of discrimination claims

at summary judgment but not at the stage of a motion to dismiss. *See Buon v. Spindler*, 65 F.4th

64, 78, 85 (2d Cir. 2023); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir.

2015); *see also Alexander v. The Bd. of Educ. of City of New York*, 648 F. App'x 118, 120 n.1

(2d Cir. 2016) ("We note that the *McDonnell Douglas* burden-shifting framework is an

evidentiary standard, not a pleading requirement, and is therefore not applied at the motion-to-

dismiss stage."). Instead, I will evaluate the statutory discrimination claims by reference to the

elements that must be pleaded and that would ultimately have to be proven at trial.

### *Failure to accommodate*

Langer alleges that Hartland failed to accommodate her religious beliefs when it denied

her request to forego weekly COVID-19 testing based on her religious objection and then placed

her on unpaid administrative leave. "Title VII of the Civil Rights Act of 1964 requires employers

to accommodate the religious practice of their employees unless doing so would impose an

'undue hardship on the conduct of the employer's business.'" *Groff v. DeJoy*, 600 U.S. 447, 453-

54 (2023) (quoting 42 U.S.C. §2000e(j)).

---

[39] Doc. #18-1 at 32-35.

In order to plead a failure-to-accommodate claim, Langer must allege (1) that she had a sincerely held religious belief that conflicted with an employment requirement, (2) that she informed her employer of this belief, and (3) that the employer failed to accommodate her belief but instead disciplined her or subjected her to an adverse action for failing to comply with the conflicting employment requirement. *See Handverger v. City of Winooski*, 605 F. App'x 68, 70 (2d Cir. 2015). Thus, "when an employee has a genuine religious practice that conflicts with a requirement of employment, his or her employer, once notified, must offer the aggrieved employee a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002). An "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Groff*, 600 U.S. at 468.

The Board argues that Langer has not plausibly alleged that she had a religious objection to weekly testing.[40] Admittedly, the allegations in the complaint about Langer's religion are thin. The complaint alleges that she raised some unspecified religious objection to compliance with the testing requirement and that she explained to school officials how the testing requirement violated her religious beliefs.[41] I might be tempted to say these allegations are not enough, because the complaint itself does not say what the religion or religious belief is, much less that it was sincerely held or how it conflicted with the testing requirement. *See, e.g., Meadows v. Lesh*, 2010 WL 3730105, at *3 (W.D.N.Y. 2010) (noting that "at the pleading stage, the complaint must still assert sufficient allegations necessary to establish that plaintiff's claim is based upon a sincerely held religious belief" and that "[b]ecause the Complaint fails to identify plaintiff's

---

[40] Doc. #18-1 at 30–31.
[41] Doc. #15 at 3 (¶ 10), 4 (¶ 15).

religion or explain the role of fasting in her religion, it fails to set forth facts demonstrating that the disputed conduct infringed upon a sincerely held religious belief").

But the Board itself has come to Langer's rescue by including as an attachment to its motion to dismiss a copy of Langer's religious exemption request.[42] In this request Langer states how her objection is based on "religious expression," including that she has "sincerely-held beliefs" and that "[t]esting me when I am healthy and without symptoms is coercing me to participate in an untruth, which I cannot do."[43]

To be sure, neither the complaint nor Langer's exemption request identifies the name of Langer's religion or its overall belief structures.[44] But "[b]oth the Supreme Court and Second Circuit have warned that courts have a limited function in determining whether religious beliefs are protected," and "the question is whether the beliefs professed are in the plaintiff's 'own scheme of things, religious' and 'impulses prompted by dictates of conscience as well as those engendered by divine commands are safeguarded against secular intervention, so long as the claimant conceives of the beliefs as religious in nature.'" *See Gardner-Alfred v. Fed. Rsrv. Bank of New York*, -- F. Supp. 3d --, 2023 WL 253580, at *18 (S.D.N.Y. 2023) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 158 (2d Cir. 1984)). In light of this standard, Langer has plausibly alleged—if only barely so—a sincerely held religious belief that conflicted with the testing requirement.[45]

---

[42] Doc. #18-4 at 4 (Exh. C).

[43] *Ibid.*

[44] Langer belatedly submitted an affidavit in opposition to the motion to dismiss stating that her objection was based on her "religious beliefs as a Greek Orthodox Christian" and that "[m]y exemption request included the weekly testing mandate which was tantamount to bearing false witness, an act prohibited by the Ten Commandments." Doc. #24-8 at 2 (¶ 4). But I decline to consider allegations that are not in either the complaint itself or a document, such as her religious exemption request, that is integral to the complaint. *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021). And, of course, "courts cannot consider new factual assertions in an affidavit submitted in opposition to a motion to dismiss." *Colliton v. Bunt*, 709 F. App'x 82, 83 (2d Cir. 2018).

[45] Not to the contrary is *Marte v. Montefiore Med. Ctr.*, 2022 WL 7059182 (S.D.N.Y. 2022)—the sole case cited by the Board to contend that the complaint does not plausibly allege Langer's religious objection. The court in *Marte*

This is not to say that Hartland lacks reason to be skeptical of Langer's claim that she has a religious objection to both the COVID-19 vaccine and the related testing requirements. Still, an employee's "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd. Of Ind. Emp. Sec. Div*., 450 U.S. 707, 714 (1981). And "[c]ourts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 715. Therefore, doubts at this time about Langer's articulation of her religious belief and how it conflicts with the testing requirement do not warrant dismissal of her complaint at the pleadings stage.

More troubling perhaps is that Langer has decided to devote most of her complaint— some 33 of the complaint's 50 pages—to elaborate allegations with detailed recitations from public documents and scientific studies about how the COVID-19 vaccine is allegedly unproven and ineffective.[46] These allegations and just their sheer prolixity suggest that Langer's real reason for objecting to both the vaccine and related testing requirement was because she does not believe the vaccine works. And an objection to the science that supports (or does not support) the COVID-19 vaccine is not an objection based on religion.

Nevertheless, the true reason for Langer's objection to the testing requirement is an issue I should not resolve at the pleadings stage of this litigation. Whether Langer had a genuinely religious reason for objecting to testing for COVID-19 is a question for the parties to explore in discovery and, if necessary, to be resolved by a factfinder at trial. The fact that Langer—in light of her shaky articulation of her religious objection and the vehemence of her *non*-religious

---

did not dismiss the complaint for lack of allegation that the plaintiff had a sincerely held religious belief (as the Board claims); instead, it was because the plaintiff "never allege[d] that [she] had a bona fide religious belief that conflicted with the [COVID-19 vaccine] mandate." *Id.* at *3. Here, by contrast, Langer adequately alleges that her religious belief conflicts with the COVID-19 testing requirement.

[46]  Doc. #15 at 10-43.

objections—may face an uphill battle to prove that she had a sincerely held religious belief that conflicted with the vaccinate-or-test requirements does not mean that I should grant the Board's motion to dismiss without further discovery and inquiry. *See, e.g., Allen v. Benson*, -- F. Supp. 3d --, 2023 WL 5961647, at *11 (E.D. Tex. 2023) (denying motion to dismiss plaintiff's religion-based objection to participating in COVID-19 testing notwithstanding court's doubts about the integrity of the plaintiff's stated religious objection); *but see Ulrich v. Lancaster Gen. Health*, 2023 WL 2939585, at *5-6 (E.D. Pa. 2023) (granting motion to dismiss plaintiff's religion-based objection to participating in COVID-19 testing where plaintiff's concerns were medical notwithstanding efforts to cloak these concerns in religion).

The Board next argues that Langer's proposed accommodation (to teach remotely) was not reasonable and an undue burden and that its own accommodation (to put Langer on an unpaid leave of absence) was reasonable. The Board says Langer's proposed accommodation would have required the school to hire extra personnel to be in the classroom, while Langer insists that it would not and that she was allowed to teach remotely the year before. But these questions of whether a particular accommodation is reasonable or constitutes an undue burden are fact-intensive.

Neither accommodation suggested by the parties is so plainly and obviously reasonable or unreasonable that I can decide the issue as a matter of law at the initial pleadings stage. Instead, the reasonableness of an accommodation and whether there is an undue burden is a question of fact for summary judgment or trial. *See, e.g., Thomas v. Bridgeport Bd. of Educ.*, 2022 WL 3646175, at *4 (D. Conn. 2022) (concluding on summary judgment that a proposed accommodation to allow plaintiff to teach remotely was not reasonable because in-person

teaching was an essential function of the teaching job).[47] Even if Langer may face an uphill battle on the issue of whether it would have been an undue burden to allow her to teach remotely, this is not grounds to grant the motion to dismiss without further discovery and inquiry.

Nor did the Governor's order completely relieve the Board of any duty to accommodate Langer's religion. The Governor's order required the Board to institute a vaccinate-or-test regime and to exclude Langer from school property if she did not comply. The Governor's order did *not* mandate that school districts must put their non-compliant employees on unpaid administrative leave or deny their requests to teach remotely. Nothing in the Governor's order foreclosed the Board from granting a reasonable accommodation in a manner that would have allowed Langer to continue working but without being physically present on school property. *See We The Patriots USA, Inc. v. Hochul,* 17 F.4th 266, 292 (2d Cir. 2021) (describing how a state law COVID-19 vaccination requirement for healthcare workers did not preclude employers from granting a religious accommodation under Title VII that placed workers outside the scope of the rule, that is "to continue working consistent with the Rule, while avoiding the vaccination requirement"), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021).

---

[47] The Board surprisingly cites and discusses *Thomas* in its supplemental briefing (Doc. #39 at 5-7) as if it favored its position—wholly ignoring that *Thompson* was decided with an evidentiary record on summary judgment rather than on a motion to dismiss. The Board then repeats its error by filing yet another supplemental letter brief to highlight and discuss a recent decision by the Seventh Circuit deciding—again, on summary judgment—that an employee's proposal to work remotely was not a reasonable accommodation. Doc. #40 at 3-5 (citing and discussing *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 646 (7th Cir. 2023)). Despite the fact that the Seventh Circuit's decision was on summary judgment, the Board misleadingly claims that "the Seventh Circuit was called upon to evaluate whether the plaintiff *stated a claim* … by refusing her request for a disability accommodation that would allow her to continue working remotely while her co-workers returned to in-person work following the COVID pandemic." Doc. #40 at 3 (emphasis added). But, of course, the fact that the case was on summary judgment meant that the plaintiff had "stated a claim" for purposes of Rule 12, and the only issue was whether the evidence supported it. The Board's discussion of the Seventh Circuit's decision in *Kinney* also ignores aspects of the Seventh Circuit's ruling that are highly unfavorable to the Board's argument that I should decide now at the pleading stage the issues of whether the accommodation was reasonable or whether it was an undue burden. The Seventh Circuit, for example, ruled "that employers cannot rely on an automatic presumption working from home is unreasonable" and that "[d]etermining whether a specific job has essential functions that require in-person work has become much more of a case-specific inquiry." *Id.* at 644.

In short, Langer has alleged plausible grounds to support her failure-to-accommodate claim. Accordingly, I will deny the Board's motion to dismiss Langer's failure-to-accommodate Title VII and CFEPA claims.

### *Retaliation*

Langer alleges that the Board fired her "in retaliation for refusing to compromise her religious beliefs."[48] "Title VII prohibits an employer from discriminating against an employee because the employee has engaged in protected activity," and "[p]rotected activity includes opposing an unlawful employment practice or otherwise making a charge, testifying, assisting, or participating 'in any manner in an investigation, proceeding, or hearing.'" *Banks v. Gen. Motors, LLC*, -- F.4th --, 2023 WL 5761361, at *20 (2d Cir. 2023) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)). "A plaintiff must show a connection between the protected activity and the adverse action, that is, that the retaliation was a 'but-for' cause of the employer's adverse action." *Ibid.*; *see also Martinez*, 185 Conn. App. at 454 (CFEPA retaliation claim "requires a plaintiff to show (1) that he or she participated in a protected activity that was known to the defendant, (2) an employment action that disadvantaged the plaintiff, and (3) a causal relation between the protected activity and the disadvantageous employment action").

The Board argues that Langer did not engage in any protected activity because "she provide[d] no basis at all for the religious request."[49] But, as I have already discussed, Langer has plausibly alleged a religious basis for her request to be exempted from the vaccination and testing requirements. Indeed, the fact that Langer's request for an exemption from the

---

[48] Doc. #15 at 6, 8 (¶¶ 29, 38–39); *see also id.* at 7 (¶ 36) (alleging that the Board "fired Ms. Langer in retaliation for her religious beliefs").

[49] Doc. #18-1 at 35.

vaccination requirement was granted makes it difficult for the Board to credibly argue that for pleading purposes she stated no plausible religious grounds in the first place.

Moreover, apart from her exemption request, Langer has also pleaded that she filed a religious discrimination complaint with the CHRO on November 5, 2021.[50] The filing of a discrimination complaint with the CHRO plainly qualifies as protected activity that may not be the subject of retaliation. *See Watkins v. City of Waterbury Bd. of Educ.*, 2022 WL 3347218, at *17 (D. Conn. 2022).

Even if her administrative complaint with the CHRO was not in fact well-founded, this would not mean that the Board was at liberty to retaliate against her for filing the CHRO complaint. That is because "[e]ven if a complaint is ultimately without merit, lodging the complaint is a protected activity so long as it was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful," and "[t]he reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances and is evaluated from the perspective of a reasonable similarly situated person." *Leroy v. Delta Air Lines*, 2022 WL 12144507, at *4 (2d Cir. 2022). It would be premature for me to decide now at the pleadings stage whether Langer had a good faith and reasonable belief to support her claim of religious discrimination before the CHRO.

The Board next argues that Langer did not suffer an adverse action. But Langer alleges that she was fired, and a termination of employment is the quintessential example of an adverse job action. Although the Board tries to characterize Langer's departure as an abandonment or resignation, this effort overlooks the basic rule that a court when evaluating a Rule 12(b)(6) motion to dismiss must assume the facts as alleged by the plaintiff to be true and must construe

---

[50] Doc. #15 at 8 (¶ 41).

the allegations of the complaint in the light most favorable to the plaintiff, not the defendant. *See Brokamp v. James*, 66 F.4th 374, 381 (2d Cir. 2023). Simply because Canelli chose to characterize the scenario in her letter to Langer as an abandonment or resignation does not make it so. The complaint alleges facts—including the short time-frame demanded for Langer's return and the immediate action taken by Canelli to advise her that she was deemed to have abandoned and/or resigned her employment—that make it plausible to conclude that Langer was fired. Therefore, I conclude that Langer has plausibly alleged an adverse action in support of her retaliation claim.[51]

The Board next disputes the causal nexus between Langer's exercise of protected activity and her alleged firing. Causation requires "a plaintiff [to] plausibly plead a connection between the act and h[er] engagement in protected activity." *Vega*, 801 F.3d at 90. Langer's burden to show "but-for" causation does not "require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 91. "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

Here, Langer filed her CHRO complaint on November 5, 2021, and the Board allegedly fired her on March 17, 2022. This gap of four-plus months between her CHRO filing and her alleged firing is enough for pleading purposes to support a retaliation claim. *See Banks*, 2023

---

[51] At oral argument, Langer also argued that her placement on unpaid administrative leave in October 2021 was an adverse action, but as far as I can tell, the complaint does not allege that this adverse action was in retaliation for any prior protected activity. If Langer believes that her being placed on unpaid administrative leave was in retaliation for prior protected activity, then she may say so in an amended complaint as discussed at the end of this ruling.

WL 5761361, at *22 ("While this Court has not drawn a bright line defining ... the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action."); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("five months is not too long to find the causal relationship" for a retaliation claim). In addition, retaliatory intent may be plausibly inferred from Langer's allegations about the rush to fire her even though she had raised her concerns about an immediate return to work.

Again, Langer may well face an uphill battle to prove her retaliation claim. After all, it looks like the Board has strong arguments in it favor: first, that it could reasonably expect that Langer would return to teaching soon after the Governor's order expired on February 15, 2022; second, that it was the Board's decision—not Langer's decision—as to whether her prompt return to the classroom would be in the best interests of her students; and, third, that it was far from reasonable for Langer to cite other vaguely described job commitments as a reason to delay returning to her career as a teacher for the rest of the school year. All these reasons would suggest that the Board did not act against Langer because of any motive to retaliate against her for asserting her religious rights. But in light of Langer's countervailing allegations, it would be premature for me at the pleadings stage to weigh the competing evidence and to decide as a matter of law that Langer has not alleged a plausible claim for retaliation.

In short, Langer has plausibly alleged a claim that the Board retaliated against her protected activity of asserting her rights against religious discrimination. Accordingly, I will deny Hartland's motion to dismiss Langer's retaliation claims under CFEPA and Title VII.

*Federal constitutional claims*

Langer additionally alleges that the Board violated her "right to bodily autonomy, medical privacy, and equal protection guaranteed under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution" by implementing EO 13G.[52] She claims that the Board "illegally coerced [her] to take a[n experimental] drug."[53] And she pleads that "the sole purpose of the mandatory testing was to punish and coerce the Plaintiff into taking a COVID-19 vaccine against [her] will."[54] In contrast to Langer's religion-based employment discrimination claims that have been discussed above, it is apparent that her constitutional claims are no less than a frontal assault on the constitutionality of the vaccinate-or-test policy that the Board implemented as required by the Governor's order.

As an initial matter, the Board argues that Langer has no standing to sue the Board because it was merely following the mandates of state law. "[T]o plead Article III standing, a plaintiff must allege facts plausibly demonstrating '(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.'" *Brokamp*, 66 F.4th at 386 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014)).

According to the Board, Langer cannot meet the "causation" requirement, because "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). But the Second Circuit has quoted this language from *Lujan* and observed that it "does

---

[52] *Id.* at 10–11 (¶¶ 36–37), 40–42 (¶¶ 112–20).
[53] *Id.* at 10 (¶ 37(A)).
[54] *Id.* at 11 (¶ 37(E)).

not create an onerous standard," that "it is a standard lower than that of proximate causation," and that "[a] defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55-56 (2d Cir. 2016). In addition, a plaintiff "need not show that a particular defendant is the *only* cause of their injury.'" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 358 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

Here, even though the Board was acting to comply with a state law mandate, it was the Board's actual implementation of the mandate that was a cause of Langer's alleged injuries. Langer's alleged injuries were fairly traceable to the Board, because if the Board had taken no action at all to implement the Governor's vaccinate-or-test order, then Langer would not have suffered any of her alleged injuries that serve as the basis for her constitutional claims. The Board's implementation of the Governor's order was the most immediate cause of the alleged injury to Langer. Therefore, even if the state law mandate was itself an additional or primary cause of the alleged injury to Langer, I am satisfied that Langer's injuries were also fairly traceable to the Board as well.

Other than citing the pertinent causation language from *Lujan*, the Board does not point to any cases ruling that a plaintiff has no standing to sue a defendant whose own conduct has injured the plaintiff if the defendant's conduct was compelled by law. To the contrary, multiple courts have rejected such arguments by defendants who have claimed to have done no more than ministerial enforcement of the law. *See, e.g., Strickland v. Alexander*, 772 F.3d 876, 885-86 (11th Cir. 2014) (plaintiff had standing to sue court clerk for harm from improper garnishment proceeding despite the fact that the clerk was merely following standard court rules for

19

processing the garnishment action that had been filed by a third party); *Kadel v. Folwell*, 620 F. Supp. 3d 339, 385-86 (M.D.N.C. 2022) (plaintiffs had standing to sue employer for wrongful denial of health benefits despite fact that employer was merely following health care plan's rules that involved "'ministerial duties,' the majority of which 'are strictly dictated by statute'"); *Voting for Am., Inc. v. Andrade*, 888 F. Supp. 2d 816, 832 (S.D. Tex. 2012) (plaintiffs had standing to sue county voter registrar despite fact that the registrar "is required to enforce the laws enacted by the Texas Legislature and the interpretations and regulations promulgated by the Secretary [of State], whatever those may be"), *rev'd on other grounds, sub nom. Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013). Accordingly, I decline to dismiss Langer's constitutional claims for lack of standing.

The Board next argues that it has Eleventh Amendment immunity from Langer's constitutional claims. It is well settled that the Eleventh Amendment and related principles of state sovereign immunity generally bars federal courts from granting relief in lawsuits by private citizens against the states, any state government entities, and any state government officials in their official capacities. *See generally Lewis v. Clarke*, 581 U.S. 155 (2017); *T.W. v. New York State Bd. of L. Examiners*, 996 F.3d 87, 92 (2d Cir. 2021). But the Eleventh Amendment does not extend to local governments or municipalities. *See Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015).

The obvious problem for the Board's Eleventh Amendment immunity argument is that the Town of Hartland is a local government.[55] It is not part of the State government. And the Board of Education of Hartland is a part of a local government, not a part of the State government.[56]

---

[55] *See* Town of Hartland, Connecticut, https://www.hartlandct.org/ (last accessed Sept. 18, 2023).
[56] *See ibid.* (tab reference to "Education" with link to website for Hartland School); Hartland School,

The Second Circuit has held that local boards of education in Connecticut do not have Eleventh Amendment immunity. In *Rosa R. v. Connelly*, 889 F.2d 435 (2d Cir. 1989), the Second Circuit ruled that "[t]o determine whether a local board of education is an arm of the state and thus entitled to Eleventh Amendment protection from suit in federal court, this court must examine the degree to which the entity is supervised by the state and the entity's source of funds for satisfying judgments rendered against it." *Id.* at 437. It then concluded in categorical terms that "[s]uch an inquiry into Connecticut's education system supports the conclusion that local school boards are municipal bodies for purposes of the Eleventh Amendment and thus subject to suit in federal court." *Ibid.*; *see also Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 239 (2d Cir. 2006) (same for local board of education in New York).

In its motion to dismiss, the Board argued that it was "unquestionably … an arm of the State."[57] But it cited no authority for this claim that actually involved a local school board, much less did it cite the clearly contrary ruling of the Second Circuit in *Rosa R.* Therefore, I invited the Board to submit supplemental briefing to address *Rosa R.*

The Board argues in its supplemental submission that, since *Rosa R.*, the Second Circuit has acknowledged that there are *two* tests that govern whether an entity may claim the immunity protection of the Eleventh Amendment. The first test is known as the *Clissuras* test. It is a "two-factor test" that looks to "(1) the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity, and (2) the degree of supervision exercised by the state over the defendant entity." *Leitner*, 779 F.3d at 135 (citing *Clissuras v.*

---

https://hartlandschool.com/ (last accessed Sept. 18, 2023) (Hartland School website with tab reference to "Board of Education").
[57] Doc. #18-1 at 16.

*City Univ. of N.Y.*, 359 F.3d 79, 82 (2d Cir. 2004) (*per curiam*)). The two-part *Clissuras* test is the one that the Second Circuit applied in *Rosa R.*

The second test is known as the *Mancuso* test. It is a "six-factor test" that looks to "'(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state,'" and "[i]f the factors point in different directions, a court must focus on the two main aims of the Eleventh Amendment, as identified by the Supreme Court: preserving the state's treasury and protecting the integrity of the state." *Leitner*, 779 F.3d at 135 (quoting *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289 (2d Cir. 1996)).

As the Second Circuit noted in *Leitner*, these two tests "have much in common, and the choice of test is rarely outcome-determinative," because "[t]he *Clissuras* test incorporates four of the six *Mancuso* factors." *Id.* at 137. Indeed, the Board makes no serious factor-by-factor effort to show how application of the *Mancuso* factors should lead to a different result than the application of the *Clissuras* factors that the Second Circuit performed in *Rosa R.*

Instead, the Board argues in passing that "while the application of some factors (e.g., day-to-day control, local election of board members), militate against affording Eleventh Amendment immunity to Hartland, the 'funding' element militates in favor of immunity, because a large portion of [the Board's] public school funding comes directly from the state."[58] But the Board—which bears the burden of proving its entitlement to Eleventh Amendment immunity, *see Woods*, 466 F.3d at 237—does nothing to substantiate this empirical funding claim.

---

[58] Doc. #37 at 9.

Worse yet, the Board ignores that the same argument was expressly rejected by the Second Circuit in *Rosa R.*: "Although local boards *receive much of their financing from the state*, inferior government bodies do not share in Eleventh Amendment immunity simply because they receive state funds." 889 F.2d at 437-38 (emphasis added; internal quotations and bracket omitted).

The Board goes on to argue that the Eleventh Amendment should apply because the Governor's order was binding on the Board such that it was an "alter ego" of the State for purposes of implementing the vaccinate-or-test policy that Langer challenges. But the cases cited by the Board do not support this argument.

First, the Board cites an unpublished ruling of the Second Circuit in which it affirmed a district court ruling that a local New York school district was "an arm of the state, *Lanza v. Wagner*, 11 N.Y.2d 317, 326–27, 183 N.E.2d 670, 674–75, 229 N.Y.S.2d 380, 386–88 (1962), and hence immune to suit under the Eleventh Amendment." *Scaglione v. Mamaroneck Union Free Sch. Dist.*, 47 F. App'x 17, 18 (2d Cir. 2002). This decision is unpublished and non-precedential. And its reliance on a state law decision to conclude that the school district was an arm of the state is contrary to later *published* authority of the Second Circuit which makes clear that the Eleventh Amendment inquiry is one of federal law, not state law. *See Woods*, 466 F.3d at 237. Moreover, the later published decision of the Second Circuit in *Woods* rejected the argument under federal law that a school district was an arm of the state for Eleventh Amendment purposes. *Id.* at 239. Lastly and most significantly, there is nothing in the unpublished ruling of the Second Circuit in *Scaglione* to suggest that it involved or turned on a claim in which a plaintiff was seeking to hold the school district liable for following a state law mandate.

The Board next cites a decision of the Southern District of New York that applied Eleventh Amendment immunity to some but not all out-of-state school districts that were sued on claims including that they had failed to provide a free appropriate public education by not maintaining in-person education during the COVID-19 pandemic. *See J.T. v. de Blasio,* 500 F. Supp. 3d 137, 160 (S.D.N.Y. 2020), *aff'd in part, appeal dismissed in part sub nom. K.M. v. Adams*, 2022 WL 4352040 (2d Cir. 2022). But there are many reasons this decision is not helpful. First and most importantly, nothing in the ruling suggests that its Eleventh Amendment analysis was driven by whether the out-of-state school districts were under a state mandate to act as they did. Second, the ruling did not address the status of school *boards of education*, as distinct from school *districts*—and, according to the Second Circuit this "distinction is significant." *Woods*, 466 F.3d at 240. Lastly, the ruling stated that "under California law, school districts are arms of the state" while "under Ohio law at the time, school districts were not arms of the State." 500 F. Supp. 3d at 160. The ruling did not address the status of school boards of education in Connecticut, much less did it purport to overrule the Second Circuit's ruling in *Rosa R.* that school boards in Connecticut are municipal bodies that are not entitled to Eleventh Amendment immunity.

The final case cited by the Board hales from a federal district court in Utah. *See Pomeroy v. Utah State Bar*, 598 F. Supp. 3d 1250, 1256-57 (D. Utah 2022). The district court ruled that the Utah State Bar was an alter ego of the State of Utah because "the Utah Constitution gives the Utah Supreme Court the power to govern the practice of law and promulgates the Rules under which the USB functions, including those rules concerning mandatory membership and fees." *Id.* at 1257. This decision is distinguishable because there was nothing to suggest—as the facts do here—that the Utah State Bar was a local government or municipal entity.

Nor did the district court in Utah apply a test similar to the *Clissuras* or *Mancuso* tests which the Second Circuit requires me to apply. Those two tests are an "entity-based" approach to whether a particular entity constitutes an arm of the State for purposes of the Eleventh Amendment. That is, they turn on the fixed nature of the governance and structural relationship between the entity and the State. The "entity-based" approach that the Second Circuit applies is different from a functional or case-specific "activity-based" approach, which turns on considering the particular activity of the entity that is the target of a lawsuit and how that particular activity relates to the State. In essence, the Board is making an "activity-based" argument in this case—that it is an arm of the state as to its implementation of the Governor's order. As one commentator has noted who has surveyed the law of the Eleventh Amendment across the federal circuit courts of appeals, the "entity-based approach is much more common among the circuits than the activity-based approach." *See* Kelsey J. Dayton, *Comment, Tangled Arms: Modernizing and Unifying the Arm-of-the-State Doctrine*, 86 U. CHI. L. REV. 1603, 1628 (2019). In light of the Second Circuit's entity-based approach, I choose to follow *Rosa R.* and conclude that the Board is not entitled to Eleventh Amendment immunity.

Turning to the merits, however, I conclude that the very nature of Langer's constitutional claim—a claim that seeks to hold the Board liable for implementing a state-mandated COVID-19 vaccinate-or-test policy—dictates the dismissal of that claim. The starting place for this conclusion is that the Board as a municipal entity may only be liable under § 1983 to the extent that any violation of a plaintiff's constitutional rights was caused by a municipal policy, practice, or custom. *See Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).

This *Monell* standard of liability pre-supposes that it is the municipality's *own* policy at issue, not a policy of the state or federal government that the municipality is mandated to follow. After all, it would make no sense to hold a municipality liable for money damages just because it obligatorily followed binding higher law.

The Second Circuit has recognized as much in "establish[ing] the framework for assessing asserted constitutional violations arising from municipal enforcement of state law." *Juzumas v. Nassau Cnty.*, 33 F.4th 681, 688 (2d Cir. 2022) (*per curiam*) (citing *Vives v. City of New York*, 524 F.3d 346 (2d Cir. 2008)). The first question is "whether the municipality had a 'meaningful choice' as to whether it would enforce the law." *Ibid.* (citing *Vives*, 524 F.3d at 353). And, if it did, then the second question is "whether the municipality adopted a 'discrete policy' to enforce the law that represented a 'conscious choice' by one of its policy makers." *Ibid.* (citing *Vives*, 524 F.3d at 353).

The answer to the first question ends the matter. The Governor's order left the Board no meaningful choice. It was required to carry out the order to vaccinate-or-test any schoolteacher on school property.

Langer tries to resist this conclusion by pointing to a provision of the Governor's order stating that no covered employee could go on school property "without prior written authorization of the employer."[59] From this Langer argues that the Board had discretion to give written authorization to her to be on school property. But this part of the order is directed to covered employees, not to school districts. There is nothing in the Governor's order that conferred discretion on the Board to allow Langer on school property to teach her students if she refused to comply with the vaccinate-or-test state mandate. *See Lebovits v. Cuomo*, 2022 WL

---

[59] Doc. #18-2 at 12 (§8(a)).

344269, at *4-5 (N.D.N.Y. 2022) (similarly dismissing § 1983 claim against a municipality that followed state governor's mandatory COVID-19 order).

So Langer's constitutional challenge to the Board's implementation of the Governor's mandatory order fails as a matter of law. Accordingly, I will dismiss Langer's constitutional claims as alleged in Count Three. These claims are dismissed with prejudice as to the Board because it would be manifestly futile for Langer to try to re-assert claims against the Board that are premised on the Board's following of a state law mandate.

Langer argues in her supplemental briefing that "Ms. Langer's § 1983 claim is that the Hartland BOE violated her constitutional rights by placing her on unpaid administrative leave after refusing to comply with the Vaccine Mandate based on her religious objections."[60] No, it is not. A review of the 33 discursive pages of allegations in Count Three of the complaint fails to disclose any mention of religion.[61] And it is a very basic rule that a party cannot amend its pleadings by means of briefing in opposition to a motion to dismiss. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

In short, although Langer has standing and the Board lacks Eleventh Amendment immunity, Langer has nonetheless failed to allege plausible grounds for relief with respect to her constitutional claims to bodily autonomy, medical privacy, and equal protection under the Fourth, Fifth, and Fourteenth Amendments. Accordingly, I will grant the motion to dismiss Count Three of the amended complaint.

---

[60] Doc. #38 at 4.
[61] Doc. #15 at 10-43. The most that can be said is that the first paragraph of Count Three expressly incorporates prior allegations of the complaint which allege statutory—not constitutional—religion-based claims involving failure to accommodate and retaliation. Because the elements for a statutory claim may differ from those for a constitutional claim, incorporation by reference of statutory violations is not enough to plausibly allege a violation of the Constitution. Langer has counsel, and it is not too much to ask that counsel expressly allege the requisites for any specific constitutional claim.

CONCLUSION

For the reasons set forth above, the Court DENIES in part and GRANTS in part the motion to dismiss of defendant Hartland Board of Education (Doc. #18). The Court DENIES the motion to dismiss Counts One and Two of the amended complaint because they allege plausible claims under Title VII and CFEPA for failure-to-accommodate Langer's religion and for retaliation against Langer for engaging in protected activity. The Court GRANTS the motion to dismiss Count Three of the amended complaint for failure to allege facts that plausibly show that any violation of Langer's constitutional rights was because of the Board's own policy as distinct from a state executive order that the Board was mandated to follow. The Court also dismisses Count Four on the ground that Langer has not responded to the Board's arguments for dismissal and has abandoned the claim.

If she wishes to, Langer may file any amended complaint within 30 days of this ruling. If Langer chooses to file an amended complaint, she may not allege claims that are foreclosed by the Court's ruling that the Board as a municipal entity may not be held liable for following an obligatory command of state law. The Court encourages counsel to carefully consider the drafting of any amended complaint and to ensure that the complaint does not include unnecessary detail at odds with the requirements of Fed. R. Civ. P. 8 to make a short and plain statement of the grounds for relief.

It is so ordered.

Dated at New Haven this 20th day of September 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

28